Catron, Judge.
This action was brought upon a promissory note, (and the endorsements thereon) made by Edmund Lanier to the Bank, on the 4th day of October 1820, for $5000, due sixty days after date in the ordinary form, endorsed by F. Grundy, Andrew Hays and O. B. Hays, the defendant. The note sued on was a renewal of a note for the same amount, given by E. Lanier to the Bank the 24th November 1819, endorsed by the parties aforesaid.
It is contended the first note was usurious; so the jury *244 found in the Circuit Court, and deducted the excess according to the statute of 1819, ch. 32.
The first question is, that the usury could not be given in evidence under the plea of non assumpsit, the only plea in the cause. If the exception could have been made below, it is now too late; nor will any further opinion be now given upon the practice required by the statute.— This court had the same point presented in Sumner’s executors and Tilford, this term.
Whether the case involves usury depends upon the facts. Lanier applied to the Bank to borrow $>5000, and agreed to take Farmers’ and Mechanics’ bank notes; and gave his note with endorsers at sixty days for the $>5000. The bank agreed with him that he might pay the note in their own paper, or other current money, such of course as was equal to theirs and taken in bank. In June 1819 the Nashville bank and its branches had stopped payment. The Farmers’ and Mechanics’ bank had stopped previously, about a month, perhaps, less. At the time La-nier got the money, Farmers’ and Mechanics’ notes were worth 25per centum less than Nashville bank paper, and that was 10 per centum below specie. It is contended that the Farmers’ and Mechanics’ notes were sold to La-nier; that it was a purchase on his part, trusting to the solvency of the bank which had issued them; — and hence, the contract could not be usurious, more than the sale of an ordinary note of hand. Suppose this be the fact— still, it may be usury under certain circumstances. If a pretended sale of goods be made at an over-value, and a note taken at, say, sixty days, for the money, with a view of excessive gain; anda lending and borrowing in fact;— it is within the statute. So if stock be sold for the same purpose. Doug. Rep. 730. 7 Mass. Rep. 268. Amb. 371. Tide. 4th Hen. and Munf. 490. 6 Munf. 472.
These notes were clearly, at the most, only worth ‡75 in specie for each hundred called for on the face of the notes; — the bank in extremely bad credit. The notes passed off as cash at their full value — a note for current dollars taken, due- in sixty days, and the usual discount deducted,
*245 It is pretty certain that it was an ordinary lending and borrowing, in the common course of business in the bank; that the notes of the Farmers’ and Mechanics’ Bank, were treated as cash by both parties, and that the loan was tended to Lanier upon condition that he would take said notes as current cash. When banks lend money, do they advance specie? No: this is never thought of in the ordinary course of business. They advance their own notes for the note discounted, or the notes taken in deposite upon some other bank; — -just as well might it be said, that the United States’ bank sells her notes; or that the Nashville bank sold her notes when she lent at interest.
Whether this were a sale of the bank notes, or a lending and borrowing within the statute to suppress usury, was a matter, exclusively, for the jury to determine. Unless they found plainly against evidence we cannot set aside the verdict. We must then, examine, as the jury did, the evidence, and exercise our discretion in granting or refusing a new trial, upon the convictions it produces in the minds of the court.
The effect of the proof is certain and simple. Lanier gave his note for $5000 at sixty days, for Farmers’and Mechanics’ bank notes: — these were only worth $75 in the hundred, 1 per centum was deducted from the $5000 note for interest. What was the loss of Lanier and gain of the bank by the contract? Twenty-six dollars in every hundred, called for in Lanier’s note, were lost. What rate of interest per annum, was this? twenty six multiplied by six produces 156! after this rate of interest, or 13 per centum per month, Lanier contracted to pay. That this was the consequence both borrower and lender supposed would flow from the contract, is free from doubt.
It is urged that tj^e contract was one of Lanier’s own seeking, to which fle earnestly pressed the bank; and, therefore, he should not be permitted to say he was imposed upon. The same might be said of every usurious transaction, where the griping and avaricious usurer aggravates the distresses of his needy debtor until he gladly accepts any terms. One object of the statute is truly, as *246 contended for, to restrain the usurer. But its main policy is to protect oppressed and necessitous men, against themselves — their imprudence needs a guardian to watch over their incapacity and folly. — In this situation the law is placed, feebly, we fear, when its frequent violation by individuals and corporations, has given, as was supposed in argument, a construction to the statute going to sanction the present transaction as lawful. Excessive usury is calculated to make the greedy lender rich by dishonest means, destructive to his morals, and withdrawing him from useful employment, making him a prowler upon the misfortunes of society, and most unworthy thereof. In all ages he has been deemed odious, and most justly so. The wretched borrower and his family are almost uniformly reduced to beggary and want. These are great public evils and should be suppressed.
Such unworthy motives may not have operated upon the directors of the bank, who had no sufficient personal, interest to furnish an inducement or wish to oppress the obligor. Little doubt can be entertained but that they granted the petition, by reason alone of the earnest solicitation of Lanier, which he deemed at the time a favor. Still, the evil is the same as it respects him, as if they had been actuated by bad motives, and the public policy and law are equally violated. The effect of similar loans could only be insolvency. Let us take this case as an instance. For two months credit, Lanier paid $¡1300; of course, he must have paid by six other contracts of the kind making up the year, $¡7800; add to this the $5000, and he then would have been indebted $12800; — a sum sufficient to ruin ' any man of property, amply abundant to supply all the comforts of life, is here sacrificed to pay exorbitant usury only in a single year. Average the property of the farmers in Tennessee, and not one in twenty is worth $¡7800. For the sake of their families, men thus unwise should have a guardian of some kind, public or private. From the proof, the case strikes us as clearly and grossly usurious.
The charge of the court left io the jury the matter of *247 intention of the parties, whether the contract were a . * " , . * lending and borrowing. The jury found it usurious, and we think, correctly.
Judgment affirmed.
Peck, Judge.
This was an action on the case, brought against Grundy by the Nashville Bank on his endorsement in favor of Lanier, on the 4th of October 1820 for §5000. The defence was usury.
The substance of the evidence appeared to be, that the Nashville Bank had ceased redeeming her notes, about the month of June 1819. Her paper had depreciated 8 or 10per centum, but was currently received in the payment of debts. The contract had been made with the bank m November 1819. A note was then given and had been renewed every sixty days. The note on which the action was founded, being the last. The first note had been given under the following circumstances: La-nier was building in the town of Nashville, and was in distress for money. The Bank was not in the habit of making loans, unless to a few individuals. After several applications it was agreed that Lanier should have the accommodation at bank, provided he would take notes of the Farmers’ and Mechanics’ bank, at their nominal value, and would pay the bank in her own notes, or in notes at par, passing currently. On Lanier procuring Hays and Grundy for his endorsers, the note was discounted, and the bank deducted the interest for 64 days, and then took out §1200, which was applied by the bank to the payment of Elam’s note, on which Lanier was an endorser. The balance §3764 67, was paid to Lanier or his order, in notes on the Farmers’ and Mechanics’ bank.
These notes, when Lanier received them, were greatly under par, from 25, 30 to 37 per centum. They did not pass currently. The other notes of the state were called current, although from 8 to 10 per cent under par.
The defendants waived the question whether the note was void for the whole, under the act of 1741, agai.nst usury, and relied upon the deduction of (ho usurious inter *248 est, supposing the last executed note to have been of the ^ con(rac(;>
Verdict for $>4502 35, a new trial was moved for by the bank and refused. The bank prosecutes this writ of error. It is now insisted, there was no usury in the transaction, (the jury having made a large deduction) and that the court ought to have granted a new trial. The charge of the court has been examined, and taking it all together, we are satisfied that it was well left to the jury to say, if the transaction in its origin, was a contract for the lending oí money; and whether, in such lending there was not a shift or device, which was designed to, and did, cover usury.
Lanier was in want of money, and made repeated applications to the bank for an accommodation. We think it not material if the application first came from him to receive the notes of the Farmers’ and Mechanics’ bank. The bank with whom he was negotiating, knew iwo things: first, that these notes were not money; — and, secondly, that if they could be called the representatives of money, their value was greatly impaired, and that Lanier in receiving them was getting not more than about ‡3500, for his note, well secured to the bank, for the sum of $5000. In addition to this hard measure it ought not to be overlooked, that Lanier, as the endorser of Elam, was compelled to become the principal for his debt and furnish endorsers, thereby coercing a liability direct and positive, whereas, by law, he could only have been reached, while standing as endorser, by the use of strict diligence on the part of the bank.
In treating oí this transaction many reasons force themselves upon the mind, why it should be dwelt upon with minuteness; not because we think the law arising difficult, but because of the unequal conflict.
Lanier was a private individual in distress — his dealing was with one of the public institutions of the state; — an institution, enjoying many privileges. She had power to use a fictitious capital to a great extent, by issuing a greater amount of notes, than she had cash on hand. Her *249 transactions were conducted through a board, consisting of a president and directors, their oaths binding them, 44 honest!y and impartially to discharge their duties”'— and their acts were not subject to scrutiny, unless it came necessary to develope them in a court of justice.
■ But it is the more important because limitations in granting the charter had been imposed upon the managers of the corporation. Without pretending to notice all of them, it will be sufficient to recur to the 15th and 19th articles.
“That said corporation shall not directly or indirectly deal or trade in any kind of stock, except bills of exchange, gold or silver bullion; or,, in the sale of goods really and bona fide pledged for money lent and not repaid in time — or, in goods, the produce of her lánds.” And for violation of this provision it is declared: “that if said corporation, or any person or persons for, or to the use of the same, shall deal or trade, in buying or selling any goods, wares, merchandize or commodity whatever, contrary to the provision of this act- — shall forfeit and lose treble the value of the goods, wares, &c. &c. one half to the use of the informer, and the other half to the use of the state.”
There is no hazard in saying that this transaction de-velopes a selling, to Lanier, prohibited articles. Farmers’ and Mechanics’ notes were not money; and it is not pretended that they had been pledged to the bank for money actually lent. If the bank insist this was not a sellinghnt a lending of money, then the usury is palpable. If she insists it was a selling of the commodity, Farmers’ and Mechanics’ notes, — then, it is a violation of the sections to which I have referred in the charter; dud of course, by this clause in the charter, it is a question well worth consideration whether it did not make the contract void.
It may be fairly inferred that the very evil intended to be provided against, has been brought about, (to wit)— bartering, shaving and disposing of assurances for money.
Art. 19, “bonds, notes and bills or other securities for the payment of money, shall not be received at said bank *250 for collection, unless on the face of them, made payable, ^ ^ JfasXivillC Bank.”
These cautions used in this charter, plainly show, that the framers of it had acquired wisdom by the history oí abuses of institutions of a like nature, that had existed before: — and, out of abundant caution,had set down these prohibitions, to prevent oppression and abuse. One great use of law is, to prevent the encroaches of the strong upon the weak.
A hank, created without proper restriction, would be a giant, of all monsters, the most to be dreaded. Her concentrated wealth; her acts in conclave; the general circulation of her assurances; and her right to use fictitious capital to some extent — the seductive influence of a rapid increase of money and property, naturally beget aristocracy of sentiment and feeling, resulting in cupidity and a total destitution of sensibility to distress. Hence the quaint phrase, “that a corporation hath no soul.”
In the State of Tennessee, at the time of this transaction, there were, at a moderate calculation, three millions of dollars in constant action, the stock of fifteen banks in various parts of the States, all authorized by law. Discounts were, it is believed, uniformly, at sixty days. The interest paid by the borrowers to these institutions could not amount to less than $15000, every two months, making the enormous sum of $90,000 per annum, supposing the transactions all to haye been fair and honest. But tolerate the principle that the banks could, at pleasure, deal in the paper of each other, could buy and sell it, and instantly, there might be an increase, at an astonishing ratio. Then it would become the interest of the banks to depress the paper of one, and advance the paper of another. The rise or fall of thé paper used as a currency, and subject to barter, would be dependant on the banks, just as one or more might wish to use it.
Did one wish to use it as a set off against her own paper, in another bank? Depress the value of the notes of such other bank, and the means of procuring the depressed notes, at «'profit to the debtor, is at once, afforded,, *251 It is no answer to say, such debtor bank may be run upon; she stops payment, but progresses with her purchases. Suppose the other bank, as a counteracting measure, also stops payment — then, the paper of both is depressed. Here, perhaps, it will be said, if this war, between sister institutions, threatens extermination, let them suffer for their folly or wickedness. I say, no; the evil does not stop at their doors — it is immediately shifted off and all the loss falls upon the community: — half a million of money, in small notes,is in the hands of credulous citizens; almost every man has a small sum. To enter into suit against a bank, would be folly — the sum is too small, and the course of justice too tardy. Then, it is, you first hear of the shaver, or broker as he is more politely called.— Through him every honest man in the community can be accommodated in having his money shaved at from 33 to 50 per centum; — -just as men of capital shall bid against each other. But this is less than half the evil. The banks will not take such notes as they hold on other banks and have them scaled by brokers, and share a common fate with the other holders, who had confided in the honesty and solvency of these institutions. And, supposing the banks not to be secretly concerned with the brokers, as a means of taking up their own paper; yet, they can find men in the situation of Lanier — in debt and in distress. With such, shift and device can be, and, it seems, have been resorted to. To him the depressed paper will be lent, and used as a means of either getting in and sinking their debt, or, procuring, by ample endorsement, the repayment of a sound currency, for what they well knew at the time, would, in one hour, receive the stamp of the broker, at whatever discount he might choose to dictate.
By acts like these, the fortunes of men have been jeopardized and often times destroyed. The corroding influence has rawed upon the community, until longer endurance would be a crime. Attempts of the legislature to apply remedies had proved unavailing: the creatures of her own creating, had become too strong. False re *252 presentations of solvency — a pretence, that some bank or combination from another state, had made a run upon some of them, and that thereby, ruin to the state would follow, by a sudden withdrawal of specie — the truth was kept concealed, that sometimes the stockholder had borrowed out twice what he had paid in. And the favorable report of the two credulous politician, was scarcely circu-Iated, before insolvency was confessed. I say, insolvency, because when the paper has fallen one half j the effect is the same as if a commission of bankruptcy had issued.
The consequence has been too obvious — all society, around where the evil existed, has been tainted with a spirit of cupidity and disposition to overreach. Good faith between man and man, is not, as formerly, to be looked for. Friends, good natured to a fault, have been drawn in, as securities, and fallen with the principal.— Sometimes a deed of trust, or a mortgage, taken as an indemnity, by an endorser, while it saved him or became the groundwork of speculation, brought whole estates under the hammer of the crier.-
To recount all the misery and evil spirit, engendered by the system, conducted as it has been, would require a volume. Some signs would seem to indicate, that the cloud is passing off; it is, however, much to be feared, that the storm has only shifted direction. Private banking associations, brokerage, and individual note shaving, have all been heard of, in the argument of this cause.,
The fate of a single individual has, sometimes, awakened a slumbering community into action,and the revoluti on, which followed, has produced reform. How strange does it seem that the act of 1741, against usury, which made void this corrupt agreement, should have been repealed, just in time to save the bank from suffering the forfeiture and penalties imposed by that act, of eighty years’ standing — that had received construction, and had rooted out the crime of usury. It is just removed at the moment Lanier was placed in a situation to be ousted of its salutary provisions. The humble substitute, the acíof J8IG has, it is true, afforded some relief in this instance, to the *253 endorsers. Bat it is certainly worth remarking, that this corporation, instantly, on the repeal, grew bold in the defence of taking usury, knowing, as she did, there could then he no forfeiture for the penalty incurred, that being surrendered by the act. And the notion of an indictment against a bank, seems somewhat novel — see act of 1819, ch. 32. These things show that innovations ought always to be first well weighed, before ventured upon. The act of 1819, has no terrors-for a bank;.for if she lose the usury, with her, the matter ends there; while had it been a private individual, he would not only be subject to the loss of the usury, but to a prosecution for the offence; and might, on conviction, be fined at the discretion of the jury. .It would be illiberal to suppose that bank influence produced so glaring a difference: but while that difference is so visible, the court will not exercise a great latitude in favor of the bank, to take a case out of the operation of the act. They will not suppose, because it was possible for Nashville bank notes (in which this payment might have been made by Lanier) to fall as low as Farmers’ and Mechanics’ notes, — that, therefore, there was no usury in the case.
This being the first time the late act has been brought before us, one question which the record exhibits, but which has not been adverted to in argument, ought to be noticed, because the silence of the court, touching it» might, in after times, incline the minds of some to a wrong conclusion.
The original agreement, securing the usury, was under the act of 1784: that reduced to writing, under the act of 1819, as has been before remarked. The,last note, which is the foundation of this action, was given, since the act of 1819. The proviso to the last section of that act, leaves the act of 1784, in full operation, as to all previous contracts. The construction of the act of 1784 has been, that giving a new note for the same contract and to the same party, did not take off the stain of usury; for it was but shift or device, to take the new note, and the party had a right to go back to the origin of the transaction, such new note, notwithstanding.
*254 The acts against usury arc public laws, which the court is bound to notice when the record presents matter arising under them. Courts have never been compromising concerning them in favor of an offender. We are, therefore, thrown directly on the point, whether we will stand by and see the act violated, by allowing an assurance declared void in the whole, to be made good and effectual by consent, for a part, because reduced to writing under the act of 1819. In short, whether, when he has made out his case, the court will sanction the application of a law, less for his benefit, under the provisions of which he was not intended to be brought, and, indeed, under our constitution, could not be. If concluded by consent, then, this judgment must be af&rmed. But it would seem we can render no other judgment inasmuch, as the defendants below, are not asking for a reversal, and because we are constrained, reluctantly, to confine ourselves to the date of the contract.