**HUNT TOOL COMPANY, Plaintiff,**

v.

**SOUTHERN TOWING & SALVAGE CO., Inc. and the M/V CROWN POINT, Defendants.**

**No. 6129.**

United States District Court
E. D. Louisiana,
New Orleans Division.

Nov. 2, 1967.

W. Eugene Davis, James H. Roussel, New Orleans, La., for plaintiff.

James J. Morrison, New Orleans, La., for Southern Towing & Salvage Co., Inc.

RUBIN, District Judge:

This is an old law suit, which, when finally reached for trial, was heard in relatively short time. Good briefs have been promptly filed by each party.

Hunt Tool Company ("Hunt") seeks to recover for repairs made to the M/V CROWN POINT at the request of Southern Towing & Salvage Co., Inc. ("Southern"). The M/V CROWN POINT was owned by McClanahan River Company and was under bareboat charter to Southern. The repairs were required in large part when it struck a submerged object and sank near Cape Girardeau, Missouri. The vessel was thereafter raised and brought to New Orleans where she was put in dry dock and was the subject of a survey by representatives of the hull underwriters.

After the damage had been surveyed and itemized, the surveyors representing the hull underwriters of the M/V CROWN POINT, Thomas L. Stanley, Jr. & Associates, prepared an "Invitation for Quotation" dated January 2, 1962, specifying the repairs and renewals to be effected to the M/V CROWN POINT, and requesting bids from the various shipyards in the area. The invitation to bid included the following stipulations:

"Attached are specifications for the repairs and renewals to be effected to the above named vessel * * *."

* * * * * *

"Should the Contractor require the removal of any parts of the vessel * * or her engines * * * the same is to be done by him and all such removals must be subsequently replaced, and any damages resulting therefrom are to be made good by the Contractor and at his expense * * *."

* * * * * *

"Should the Contractor exceed the time agreed on in his contract for carrying out the repairs, renewals or replacements, etc., specified or implied, the sum of $275.00 (two hundred seventy-five dollars) is to be paid by him as liquidated damages for each and every day in excess of the time named by him for the completion of his contract."

Among the specifications, the following work was called for:

"6. All new and disturbed work to receive one (1) coat of prime and one (1) coat of Owners' color paint."

"31. GMS 12–567A Main Engine: Strip down and completely disassemble the 12–567A General Motor main propulsion engine for cleaning, examination and refitting. When directed, reassemble and build up engine complete * * *.

"37. Clean, prime and coat engine room * * *."

"38. * * * All machinery, gear and equipment to be operationally tested and proven to be in good order to the satisfaction of * * underwriters' Representatives * * *."

Hunt was the successful bidder. On January 12, 1962, the work was awarded to it under a contract providing that it was to be done in 28 continuous running calendar days, subject to prompt delivery of materials. The job was not completed until March 18, 1962, some 62 days after it was begun. The defendant therefore claims 34 days demurrage, or a total of $9,350.00 in liquidated damages at the

daily demurrage rate of $275.00 stipulated in the contract.

There is a serious dispute between the parties concerning the cause of the delay. There were only two witnesses at the trial, the manager of the plaintiff's shipyard and the president of the defendant corporation. I place more credence in the version of the facts given by the plaintiff's witness. Therefore, I find the facts to be as follows:

Within a short period of time after work was begun, the engine was removed from the vessel and disassembled for cleaning, refitting and examination as required by the specifications. In the course of removing the engine, the engine housing was broken. Hunt tried to get a replacement housing but could not find one. Its efforts delayed completion of the job. In addition, however, there was a delay because, upon examination of the engine, the surveyors determined that certain parts needed replacement as a result of ordinary wear and tear. Since these parts were merely worn and not damaged as a result of the sinking, the surveyors refused to authorize the cost of replacing these parts for the account of the hull underwriters of the vessel. A dispute then arose between respondent's Captain Chester Flick and the hull surveyors over who was going to pay for replacement of these parts.

During this controversy, Hunt was unable to continue working on the vessel since it was necessary to reassemble and reinstall the engine before any further work could progress. In the meantime, Hunt received a telegram dated February 23, 1962, from the owners of the vessel advising that Hunt was not to release the vessel to anyone without prior permission of the vessel's owner. This telegram together with other information received by the shipyard caused it to doubt Southern's solvency. Captain Flick verbally indicated that Southern would not be able to pay for any repairs until the vessel returned to work. Because of the controversy between Southern and the surveyors over who was going to pay for the parts, Southern's admitted inability to pay for the extra parts, and the conversations and telegram from the owner, all work stopped on the vessel pending the decision as to who was going to pay for these parts.

The insurance company would not pay for the cost of repairing the sinking damage if Hunt did not complete the specifications on the vessel. Therefore Hunt and Southern agreed that Hunt would complete all repairs including supplying the additional parts not covered by the insurance policy, and that Southern would begin paying Hunt back as soon as the vessel returned to service. After this agreement was reached, the necessary parts were ordered from the local supply houses; but because some were not readily available locally, there was an additional delay pending arrival of the parts.

After the engine had been reassembled and reinstalled in the vessel, the remainder of the repairs required under the specifications was completed and the vessel was delivered on March 18, 1962. In addition to supplying the engine parts, Hunt did other repair work at the same time. Invoices in the amount of $42,397.56 (including three invoices for interest in a total amount of $473.28) were rendered. Insurance covered $33,957.80 of this sum, leaving a balance of $8,439.76 due.

Thereafter, Captain Flick and Hunt's Mr. Moore held several meetings concerning Southern's indebtedness. As a result of one of these meetings, Captain Flick wrote Hunt a letter dated April 23, 1962. This letter did not deny liability to Hunt. It asked for credits for six items against the amount Hunt claimed as due and said, "Considering the lay days in your bid against the actual completion days, we feel that it is only fair that you should credit us, in the way of our deductable [sic] ($2,000) [sic] giving us a total credict [sic] of $4,399.02." Hunt credited Southern's account with $2,000 designating this as "Credit issued to apply against your account as per agreement," and also credited Southern with an additional amount of $2,264.99. Hunt

claims the balance, or $4,174.77, has never been paid.

Hunt's suit is founded on its invoices for work done not covered by the Invitation to Bid. Southern says the claim is for work done on "open account," rather than under the contract, but I do not think that it is material whether the claim is based on additional work furnished under the Invitation to Bid or open account. In any event, Southern admits that Hunt had performed all of the work called for by the invoices and that the prices charged were reasonable.

■ Southern's brief argues that "Hunt made no attempt to establish that that any part of the invoices claimed upon were for extra work not covered by the contract, except the single item of painting of the engine room," but I find that Hunt did in fact establish just that: there was extra work and it was done at Southern's request. Of course it doesn't matter that work orders were not issued: the work was orally authorized by Captain Flick, Southern's representative, and he clearly had authority to do so. Indeed, Captain Flick admitted that he had done this. I find that the work for which payment is claimed in this suit was not contemplated by the Invitation to Bid, it was expressly authorized by Southern, and Southern owes for it.

Southern claims it is "not subject to invoices" for the work admittedly done by Hunt "because that work was done on contract, and not on open account." This argument assumes that the replacement of engine parts was covered by the bid on the original invitation. I do not think it was. This was clearly an extra and Captain Flick admitted in his negotiations with Hunt that it was. While Southern also claims that some of the work had not been properly done, that defense was not pressed at the trial, for it is the subject of a state court suit.

### DEMURRAGE

■ Southern urges that under the contract it is owed demurrage amounting to over $9,000.00. Hunt claims the letter of April 23 was a compromise and that the credit of $2,000.00 eliminates any additional demurrage charges under the contract. Southern says it is not legally effective as a compromise because it fails to meet the requirements of Louisiana law. Whether or not it was a compromise does not appear to me to be material. The work on the vessel was delayed partly because of Hunt's fault and partly because of matters chargeable to Southern, principally inability to locate engine parts. Replacement of worn parts was an "extra" under the contract, and the delay in getting these parts was not chargeable to Hunt. There is no way now to determine how many days to charge against Hunt. When the facts were fresh in everyone's minds, Hunt's authorized representative and Southern's met and agreed on a demurrage amount of $2,000.00. Hunt's claim has been reduced by a credit to Southern for that amount. I accept that as the correct amount.

### SOUTHERN'S PERSONAL LIABILITY

■ In its brief Southern admits that it is liable for the repairs it ordered notwithstanding the fact that the vessel was under charter to it and the charter party prohibited it from creating a lien on the vessel. This is clearly in accordance with the authorities. When a charterer contracts with a repairman for work on the chartered vessel, the charterer is personally liable for the cost of the repairs in the same manner as any other person who contracts for work to be done. Section 973 of the Lien Act, 46 U.S.C.A. § 973, is designed to protect against encumbrance of the vessel itself. It does not shield the charterer from his personal liability when he actually contracts for the services.

### PRESCRIPTION

Southern's brief states that it waives its defense of prescription.

### INTEREST

■ The Invitation to Bid did not require interest to be paid. In the absence

of any agreement by Southern to pay interest, interest would not be due until suit was filed whether the work was done under the contract or on open account. "Interest is either legal or conventional." LSA–C.C. Art. 2924. The Louisiana Court of Appeal for the Second Circuit has quoted the following language with approval in regard to legal and conventional interest:

"'[L]egal interest is interest imposed by law, and *conventional interest is interest resulting from agreement between the parties.*'" (Emphasis supplied.)

Elston, Prince & McDade v. First State Bank, 1932, 19 La.App. 385, 140 So. 510, 513. As one of the French commentators has noted:

"[A] formal convention is necessary for [a] loan to produce interest and it is necessary that the will of the parties be expressed in terms which leave no doubt; in other terms, the judge cannot seek from circumstances the tacit will of the parties."

Bandry-Lacantiniere T. XXIII, p. 508, quoted by the Court in the First State Bank case, 140 So. at page 514. See also, e. g., Williams v. Gerson, La.App. 2 Cir., 1937, 172 So. 589, 591. Therefore, Hunt's claim must be reduced by the amount of the invoices rendered for interest, or by $473.28.

### CREDIT OF $200.00

A credit of $200.00 claimed by Southern in its letter of April 23, 1962, was not included in the credits granted by Hunt. Southern says the failure to include it was inadvertent, and I think this is true. Therefore, Hunt's claim must also be reduced by $200.00.

### CONCLUSION

With the exception of the claim for interest in the amount of $473.28 and the $200.00 that I think was inadvertently omitted from credits to Southern, Hunt is entitled to collect on its claim. Reducing the original claim of $4,174.77 by the above amounts leaves a balance due Hunt of $3,501.49.

For the reasons given, the Clerk is ordered to prepare a judgment in favor of Hunt and against Southern for the sum of $3,501.49, together with interest at the legal rate from date of judicial demand until paid. This opinion will serve as findings of fact and conclusions of law.