**CUMBERLAND CAPITAL
CORPORATION,
Appellant,**

v.

**Hubert D. PATTY, Appellee.**

Supreme Court of Tennessee.

Aug. 22, 1977.

Valerius Sanford, Nashville, William B. Felknor, Maryville, for appellant.

Rom L. Meares, David T. Black, Maryville, for appellee; Martha S. L. Black, Knoxville, of counsel.

William H. Lassiter, Jr., Taylor, Schlater, Lassiter & Tidwell, James O. Bass, Bass, Berry & Sims, Robert J. Warner, Jr., Dearborn & Ewing, Frank M. Farris, Jr., Farris, Evans & Warfield, Nashville, David G. Williams, Heiskell, Donelson, Adams, Williams & Kirsch, Memphis, Lowry F. Kline, Miller & Martin, Chattanooga, W. F. Shumate, Jr., Ridenour, Ridenour, Ridenour, Bowers & Shumate, Knoxville, Ronald S. Borod, Rosenfield, Borod, Bogatin & Kremer, Memphis, Donald G. Ward, Wilson, Worley, Gamble & Ward, Kingsport, Tenn., for Tenn. Bankers Ass'n, Inc., amicus curiae.

Charles L. Cornelius, Jr., G. Michael Yopp, Cornelius, Collins, Higgins & White, Nashville, for Tennessee Savings & Loan League, amicus curiae.

B. B. Gullett, Gullett, Steele, Sanford, Robinson & Merritt, Nashville, for Tennessee Consumer Finance Ass'n, amicus curiae.

## OPINION

HENRY, Justice.

This interlocutory appeal involves the constitutionality of a portion of the Industrial Loan and Thrift Companies Act,[1] and a construction of Article 11, Section 7, Constitution of Tennessee.[2]

### I.

#### Pleadings and Trial Proceedings

Cumberland Capital Corporation, a Tennessee corporation, organized and existing under the Industrial Loan and Thrift Companies Act, filed its complaint against Hubert D. Patty in the Circuit Court at Maryville, seeking to recover on two promissory notes having an aggregate balance of $61,887.58, together with attorneys fees thereon. It is alleged in the complaint that, simultaneously with the execution of each note, Patty also executed and delivered an appropriate Installment Savings Certificate.

---

1. Sec. 45–2001, et seq., T.C.A.

2. The Attorney General of Tennessee lodged with this Court an intervening petition taking the position that the constitutional issues "are fully presented by both parties and that the interests of the state do not require the Attorney General to be further heard." We approve his action and concur in his comment. Indeed, the briefs submitted by counsel for the respective parties and those appearing as Amicus Curiae, articulate the issues with conspicuous skill and ability.

Patty's answer and counterclaim raises a defense of usury. The counterclaim seeks to have the Court decree credit against plaintiff's claims, and a judgment for the usury allegedly paid on other obligations.

By amendment to his answer, Patty asserts that his contract with Cumberland "is illegal on its face because of violation of Article 11, Section 7 of the Constitution of the State of Tennessee." Additional allegations of usury are set forth, and the Industrial Loan and Thrift Act is assailed as being in violation of Article 11, Section 7 of the State Constitution. It is further alleged that excessive service charges were made by Cumberland.

After hearing testimony, the trial judge, in a memorandum opinion, held that "the loans were usurious under Article 11, Sec. 7 of the Constitution of Tennessee" and that Section 45–2007 was unconstitutional. He further held that "[i]f the lender charges a fee for services that are not rendered or expenses that are not incurred, or if the amount charged exceeds that expended, the excess is interest. . . ." Additionally, he held that Cumberland was entitled to compute interest at the rate of 10%, "after giving proper credit for loans paid in advance either by money, refinancing, or foreclosure."

A formal order was entered, granting an interlocutory appeal to each party and certifying two controlling questions of law:

1. Are the terms of Tennessee Code Annotated, Section 45–2007, violative of Article 11, Sec. 7 of the Constitution of the State of Tennessee?

2. If the terms of Tennessee Code Annotated, Section 45–2007 are violative of

Article 11, Section 7 of the Constitution of the State of Tennessee, is the original complainant entitled to a computation of interest at the rate prescribed by Article 11, Section 7 of the Constitution of the State of Tennessee?

Cumberland appealed from the holding that Sec. 45–2007, T.C.A. is unconstitutional. Patty appealed from the holding that interest should be computed at 10%.

We are called upon to settle a constitutional issue of first impression and substantial significance. The solution lies in an analysis of Article 11, Sec. 7 of the Constitution of 1870 in the light of earlier constitutional provisions, a succession of statutes, the prior decisions of this Court and pertinent public records.

## II.

### The Pioneer Period (1796–1835)

Tennessee's first Constitutional Convention, composed of five members from each of the eleven counties of the Territory, met in Knoxville on January 11, 1796.[3] Twenty-six days after it convened, the Convention adopted our first constitution. It was largely adapted from the North Carolina Constitution of 1776, which basically was the organic law of the Territory of Tennessee, and had been in effect in Tennessee prior to our becoming a Territory.[4]

The Constitution of 1796 does not even contain a passing reference to interest or usury. It is apparent that the delegates to our first constitutional convention believed that the matter of interest addressed itself to the law of the market place and could

---

**3.** While subsequent constitutional conventions may lay claim to higher intellectual attainments, the Convention of 1796 was undoubtedly composed of more Tennesseans of prominence in public affairs. Davidson County, for example, was represented by Andrew Jackson, seventh President of the United States, James Robertson, founder of Nashville, and John McNairy, our first federal judge, who served in that capacity for forty years. Future Governor Joseph McMinn and future United States Senator William Cocke represented Hawkins County. Other members were Joseph Anderson of Jefferson County, who served as a United States Senator for sixteen years and as Comptroller of the Treasury of the United States, William Blount of Knox County, the Territorial Governor, James White, the founder of Knoxville, and Judge William C. C. Claiborne, first Governor of the Mississippi Territory and later Governor of Louisiana. See J. Caldwell, Constitutional History of Tennessee, 130–132 (1907).

**4.** Ibid., p. 133.

most effectively be regulated by the legislature, a body created to represent the people and designed to respond to the varying needs and demands of the state's economic, political, social and cultural affairs.[5]

Under Condition 8 of the Cession Act, Chapter 3, North Carolina Acts of 1789, all the North Carolina acts that were in effect at the time of the cession became effective in the ceded territory. Article 10, Section 2, of the Constitution of 1796 provided:

All laws and ordinances now in force and use in this territory, not inconsistent with this constitution, shall continue to be in force and use in this state, until they shall expire, be altered, or repealed by the legislature.

Thus, by virtue of the Cession Act and this constitutional provision,[6] Chapter 11, of the North Carolina Acts of 1741, relating to interest, took effect in the State of Tennessee as of June 1, 1796, upon our admission to the federal union. *Egnew v. Cochrane*, 39 Tenn. 320 (1859).

The North Carolina Act of 1741 provided in pertinent part:

That no person . . . shall, directly or indirectly take, for loan of any monies, wares, merchandizes, or commodities whatsoever, above the value of *six pounds, by way of discount or interest, for the forebearance of one hundred pounds, for one year*, and so after that rate for a greater or lesser sum, or for a longer or shorter time. . . .

Violations were punishable by forfeiture of "the double value of the monies, wares, merchandizes and other things so lent, bargained, exchanged, or shifted. . . ."

Thus, at the very outset the amount of interest was restricted and usury was punished severely.

The 1741 Act remained in effect in Tennessee until the adoption on November 13, 1819, of Chapter 32 of the Acts of 1819. This act fixed the legal rate at 6%, provided for the recovery of excess interest, made usury an indictable offense, and specifically repealed the 1741 Act.

It should be noted at the outset that the practice of discounting was recognized in the 1741 Act and, since the early days of our statehood, has been a practice in this state. In any given commercial transaction involving the practice of discounting, the result must be gauged against existing statutes and constitutional provisions. As the earlier cases are reviewed and analyzed it must be borne in mind that for the first three quarters of a century of our statehood we had no constitutional limitation on interest. Thus, the interest rate, including discount, was governed solely by statute until the Constitution of 1870.

While the practice of discounting is discussed more fully *infra*,[7] for present purposes we merely note that discounting is "the taking of interest in advance", Black's Law Dictionary (Rev. 4th Ed. 1968). It is characterized by a transaction wherein the lender deducts the interest from the principal at the time the loan is made.

Our early cases recognize that a note may be sold at a discount, but if the seller agrees that he will be bound for the whole amount of the note, the transaction may be rendered usurious. *Campbell v. Read and Gray*, 8 Tenn. 392 (1828).

Our early courts were quick to denounce usury, whether arising from discounting or otherwise. See e. g. *Nashville Bank v. Hays*, 9 Tenn. 243 (1829) and *Lawrence v. Morrison*, 9 Tenn. 444 (1830). An early case of particular note is *Dews v. Eastham*, 10 Tenn. 463 (1830), arising under the Act of 1819. There the borrower attempted to negotiate a cash loan and was told by the lender that he had none to lend but would buy cash notes at the usual discount. The borrower then arranged for his brother to execute notes totalling $112.50, payable to him and by him, endorsed to the lender.

---

5. Thirty-seven states of the Union have no constitutional provisions relating to interest.

6. See also Art. 11, Sec. 1, Constitutions of 1834 and 1870 for similar continuation clauses.

7. See Section III *infra*.

The parties agreed to a judgment in a justice of the peace court in the amount of $112.50 payable four months and twenty days later. As a part of this transaction the lender tendered the borrower the sum of $75.00, taking a discount of $37.50, plus 6% on the amount of the judgment, a total interest rate of over "140%". The court held that the "notes were made to sell in the market at a discount" and branded this as "extremely gross" usury and "a high-handed oppression". 10 Tenn. at 464, 466.

No other cases of any consequence were decided during this period.

## III.

*Constitution of 1834; statutes, decisional law and other developments leading up to the Constitution of 1870.*

### a. The Constitution of 1834

The Constitution of 1834 came as a result of the growth and development of Tennessee over a forty year period that saw our state evolve from a primitive society into the early stages of agriculture, manufacturing and cultural pursuits. We outgrew the old Constitution and a new one "was demanded especially to improve the method of levying taxes, electing state officers, avoiding conflicts between the different courts and to promote a good system of internal improvements . . ."[8]

The population of Tennessee in 1796 was less than one hundred thousand; by 1830 it had risen to 681,902.[9]

The Convention's sixty delegates met in Nashville on May 19, 1834, and remained in session for 104 days, adjourning on August 30, 1834. The finished product was ratified by the people on March 5 and 6, 1835, and became effective with the Governor's proclamation issued on March 27, 1835. The adoption of this Constitution terminated what has been called the "pioneer period" of Tennessee.[10]

The Journal of the 1834 Constitutional Convention is distressingly meager. It reflects that the matter of interest was referred to the Committee on local and private legislation. In submitting its report on July 24, 1834, the Committee recommended a constitutional provision to read as follows:

The Legislature shall fix the rate of interest, and the rate so established shall be equal and uniform throughout the State, so that every person and corporation may be allowed the same. But this provision shall not affect existing corporations.

The Committee report reads, in pertinent part, as follows:

There is nothing by which the best interests of the community may be so soon, and so severely, and so imperceptibly destroyed, as by the mode of regulating the interest on money loaned. The committee believes its great importance deserves a notice in the fundamental law. This clause requires that the Legislature *shall* fix a rate. (Emphasis in original). This is to *prevent the matter from being open to contract*, whereby the necessitous may be devoured by the more astute. (Emphasis supplied).[11]

The Convention rejected two formal motions to write in a provision that interest should not exceed "six per centum per annum." See Journal, Constitutional Convention of 1834, 301, 353.

As adopted, Article 11, Section 6 of the Constitution of 1834 reads as follows:

The Legislature shall fix the rate of interest, and the rate so established shall be equal and uniform throughout the State.[12]

---

8. 1 J. Moore, Tennessee, The Volunteer State, 404–405 (1923).

9. 2 R. White, Messages of the Governors of Tennessee, 444 (1952).

10. 2 R. White, Messages of the Governors of Tennessee, 443 (1952).

11. Journal, Constitutional Convention of 1834, at 161.

12. It will be noted that this is precisely the same language as is contained in the first clause of Article 11, Section 7, of the Constitution of 1870.

Again, the Convention left the rate of interest to the judgment and discretion of the legislature. It made it the mandatory duty of the legislature to fix a rate of interest, and required that such rate be equal and uniform throughout the state.

In *Perkins v. Watson*, 61 Tenn. 173 (1872), the Court stated the purpose of this constitutional provision as follows:

> Notwithstanding the Act of 1819, the *Legislature had granted to banks and other moneyed corporations the privilege of taking more than six per cent. for the use of money*, and these special charters, or rather this privilege granted to them *gave rise to sec. 6*, Article XI, of the Constitution of 1834, whereby it is provided that "the Legislature shall fix the rate of interest and the rate so established shall be equal and uniform throughout the State." That *the object of this provision was to inhibit the legislature from granting the banking corporations the privilege of taking a greater rate of interest than was allowed to individuals*, is manifest from the journals of the Convention. (Emphasis supplied). 61 Tenn. at 177.

b. *Chapter 50, Public Acts of 1835–1836*

This Chapter, captioned "An Act to fix the rate of interest in this State", was adopted February 20, 1836, approximately eleven months after the effective date of the Constitution of 1835.[13] This act made no significant change in the Act of 1819. The rate of interest was fixed at six per centum per annum, provision was made for the recovery of usury, and usury was made an indictable offense.

c. *Decisional law under Act of 1835–1836*

A significant portion of our jurisprudence relating to discounting, interest and usury developed in cases arising under this act.

In *Ramsey v. Clark*, 23 Tenn. 244 (1843), the Court, speaking through Justice Nathan Green, for the first time, drew a distinction between a "business transaction of purchasing a note" and "a negotiation for a loan of money." 23 Tenn. at 245. The sale of a note at a greater discount than six per cent was treated as lawful as opposed to a note made for a loan, which was unlawful and usurious if the discount was greater than six per cent. See also *Gooch v. Massey*, 23 Tenn. 374 (1843).

In *May v. Campbell*, 26 Tenn. 450 (1846), the Court, without citing *Ramsey*, changed the terminology somewhat by holding that a "real transaction" note discounted at 25 per cent was not usurious, but a note made to raise money and discounted at the rate of 25% was usurious and unlawful. In the one instance there was a real transaction, i. e., the purchase of commercial paper; in the latter a loan.

The holding of *May* is clarified in *Holeman v. Hobson*, 27 Tenn. 127 (1847). Involved were several notes, all purchased before maturity and at a discount in excess of the legal rate of interest. In holding the purchases not to be usurious, the Court said:

> [There is a distinction] between a note or bill, in its inception, a real transaction, and a note or bill for the purpose of raising money by sale in market. A transfer by endorsement of the former, though beyond the legal rate of interest, will be regarded as a sale of the note, and a valid and legal transaction; but the endorsement of the latter, being only a nominal negotiation, will be held a usurious contract, if transferred at more than the lawful rate of interest. 27 Tenn. at 129–130.

*Hazen v. Union Bank of Tennessee*, 33 Tenn. 115 (1853), arose under a charter provision allowing the bank to discount short term paper at the rate of 7 per cent. The Court recognized that the legal rate of interest was 6 per cent; that the "reformed Constitution of 1834" declared that interest would be uniform, and noted that "no law

---

13. This act was the basis of Sec. 1944 of the Official Code of 1858, and of Sec. 47–14–104, T.C.A.

or grant of a franchise can have legal existence which stands in opposition to it." 33 Tenn. at 121. However, the Court, noting the constitutional provision (Art. 11, Sec. 7) against impairing the validity of existing contracts, held that, because the bank's charter pre-dated the constitution, and was granted at the time when, under the Constitution of 1796, we had no constitutional interest requirements, its charter provisions could stand.

The most interesting and informative case of *Wetmore v. Brien*, 40 Tenn. 723 (1859), arose under the Free Banking Act of 1851–1852, as amended. Involved was a note discounted at the bank at the rate of 15 per cent. The Free Banking Act provided *inter alia* that banks operating under the act "shall not be authorized to discount or shave notes, directly or indirectly, at a greater discount than the other banks are allowed, under existing laws. . . ." 40 Tenn. at 724. The concluding portion of the opinion is significant:

> The regular business of discounting notes, by deducting from their face the interest for the entire time they have to run, *though in itself usurious*—as the borrower pays interest on the amount thus deducted—*has been long sanctioned by the courts, rather from necessity than upon principle*; and thus far the act is plain enough. But the prohibition upon the "Free Banks," not to "shave" notes at a greater rate of discount than the other banks are allowed under existing laws, is not quite so clear. The term "shave" has not, perhaps, heretofore been regarded as a technical term; but in our local jurisprudence, at least, it can no longer be regarded as untechnical, inasmuch as its use is sanctioned by the authors of the "Code of Tennessee."

> The *popular signification of the phrase "shaving notes," as contra-distinguished from the legitimate business of discounting negotiable paper* by the banks, is well understood. The business of purchasing notes, in the market, at less than the amount called for on their face, or par value, is common amongst individuals in the community; and by the act under

consideration, the right to do so would seem to be impliedly conceded to corporations whose business it is to lend money, and exercise other functions of banking—under certain restrictions.

> *And this business of purchasing negotiable paper is, to a certain extent, sanctioned by law, although the purchaser may thereby get greatly more than legal interest for the use of his money.* The distinction is between *real transaction paper and paper made for the purpose of raising money* by a sale in the market. See [*May v. Campbell,*] 7 Humph. 450; [*Ramsey v. Clark,*] 4 Humph. 244. This distinction is important, *between a loan, in the form of a sale,* and *an actual sale and purchase.* The purchase must be actual, and made in good faith, and not merely colorable, to cover a usurious transaction. *A note made in the course of a real business transaction, for which the original party has given a valuable consideration, is regarded as property*; and, like other property, the *owner may sell it for the most he can get,* and whatever the profit the purchaser may make on his purchase, there is certainly nothing usurious in it. The owner may be induced, by doubts as to the solvency of the maker, or the pressure of his necessities, to sell the note for less than its face, or less than its market value, and, in the absence of all fraud, this will not affect the validity of the transaction, or impart to it the character of usury. *But if the note were made for the purpose of being sold, to raise money,* or as an artifice to evade the usury laws, under the color of a sale and purchase of the paper, this will *not avail and the purchaser,* under such circumstances, with knowledge of the facts, either actual or inferable from the facts of the case, will be held *guilty of usury,* if the discount shall have been greater than the legal rate of interest. In this sense, the word "shave" is to be understood in the act of 1855–56. And in this sense, and to this effect only, is the business of "shaving" notes, or other negotiable paper, either by individuals or

banking corporations, tolerated by law. 2 Pars. on Con. 421. (Emphasis supplied). 40 Tenn. at 726–728.

### d. *The Legislative Report of 1859–1860*

It is readily apparent that "discounting", "shaving" and kindred usurious practices became matters of vital public concern. The Legislature, at the 1859–1860 session, appointed a Joint Select Committee "to investigate the present effect of the Usury Laws of Tennessee; to ascertain the amount of money used in shaving; the amount of domestic capital taken from the State to be used elsewhere, and the average per cent. paid by borrowers for the use of money. . . ." The Committee Report appears as an appendix to the Senate and House Journals of the 1859–1860 Legislative Sessions beginning at page 457. This Committee reported:

1. "that comparatively but little money is now loaned out in Tennessee, at legal rates" (Id. page 457);

2. "that the rate of interest in Tennessee is largely over that which is established by law" (Id. page 458);

3. "that the law fixing that rate for borrowed money, is no longer operative in keeping down the price of money" (Id.);

4. [that law abiding men have no inducement to make loans and] "prefer to place their money on special deposit—to hoard it up, or loan it in other States, whose laws permit something like a fair remuneration for capital" (Id. page 459);

5. that a "large amount has been banished from the state because of our unfortunate legislation, that has arbitrarily fixed the price for the use of money at a standard below its actual value" (Id.); and

6. that the rate of discount in Tennessee ranges between fifteen and twenty-five percent (Id. at 461).

In comparing Tennessee's interest rates at the time with other states, the Committee rather graphically reported:

The facts, however, show a marked contrast between the rates of interest in *those* States as compared with ours. The tendency and effect of *their* laws has been to keep capital at home—that of ours to drive it *from* the State. Their laws *invite* capital from a distance—ours, on the contrary, *repels* it from our borders. *Their* laws protect the borrower, and give him some chance to obtain money at fair rates—ours, on the contrary, create exorbitant rates of interest, and places the borrower at the mercy of the money dealer. (Emphasis in original). Id. at 462.

### e. *The Act of 1859–1860*

Appended to the report was "A Bill to Amend the Usury Laws of the State, and to establish a *Conventional* rate of Interest." (Emphasis supplied). This proposal passed the legislature as Chapter 41, Acts of 1859–1860, and, thus, we had our first conventional interest law.

Section 1, omitting the enacting clause, provided:

That whenever any person or persons shall *contract* for the loan of money, it shall and may be lawful for the lender . . . to receive a rate of interest on the same up to the time when payment is made, not to exceed ten per cent. per annum: Provided, That the parties to the [contract] (sic) shall have so *agreed*, and such *agreement* be expressed in the face of the contract, whether the same be evidenced by bond, bill, note or other written instrument. (Emphasis supplied).

It should be noted that this section, in essence, defines conventional interest. It is an agreed rate, and is frequently referred to as contractual interest. It seems to be

universally recognized that conventional interest is "the rate agreed upon and fixed by the parties themselves as distinguished from that which the law would prescribe in the absence of an explicit agreement." Black's Law Dictionary (Rev. 4th ed. 1968). See also *Hunt Tool Company v. Southern Towing & Salvage Co.*, 275 F.Supp. 139 (E.D.La.1967); *Farnworth v. Jensen*, 117 Utah 494, 217 P.2d 571 (1950); *Saulsberry v. Wood*, 180 Wash. 340, 39 P.2d 592 (1935); *Elston, Prince & McDade v. First State Bank of Plain Dealing*, 19 La.App. 385, 140 So. 510 (1932); *Fowler v. Smith*, 2 Cal. 568 (1852); 45 Am.Jur.2d, Interest and Usury, Section 1. The same authorities make it clear that "legal" interest, sometimes called "judicial" interest, is the rate imposed by law in the absence of an agreement. These rates may, or may not, be the same. The distinction between a conventional and a legal rate of interest is crucial to a proper resolution of the question of the constitutionality of Sec. 45–2007(f).

It is beyond question that as early as 1859 our legislative leaders fully knew and understood the differences between legal and conventional rates of interest.

Section 2, of Chapter 41, Acts of 1859–1860 reads, in part:

> That the rate of interest now established by law, shall continue equal and uniform throughout the State as heretofore; and no greater amount than six per cent. shall be paid on any contract or obligation, unless agreed on by the parties, according to the provisions of the first section of this Act; . . . .

Section 3 specifically authorized the purchase of notes, etc., "made for the purpose of sale, at a rate of discount not to exceed ten per cent. per annum," upon the payment of a privilege tax. Section 8 required that reports be made by February 1, 1861 and each February thereafter of the aggregate amount of all loans made.

In *Jackson v. Collins*, 49 Tenn. 491 (1870), the purpose of the conventional interest law of 1860 is stated as follows:

> The object of said statute was *to relieve the people,* by making it the interest of creditors not to sue, and also to *induce capitalists to loan their money, or bring in money from other States* and loan it, by increasing the rate of interest; and, under the first section, it was not required that any other part of the agreement should be stated upon the note tha[n] the contract to pay interest at the rate of ten per centum. 49 Tenn. at 498.

This act was passed February 21, 1860, and became effective September 1, 1860. It was in effect for 153 days, being repealed by Chapter 4, Acts of 1861, passed January 31, 1861, one day before the first reports were due. It was, however, construed in several reported cases.

The first, and most significant of these cases, is the controversial case of *Caruthers v. Andrews,* 42 Tenn. 378 (1865). The note involved provided for interest at the rate of 10 per cent. The trial judge held Chapter 41, Acts of 1859–1860, to be unconstitutional. The Supreme Court reversed, pointing out that "the constitution imposes no restraint or limit upon the legislature, upon the subject of interest" except that the rate "shall be equal and uniform throughout the state." 42 Tenn. at 386.

The Court treated the Act of 1860 as being an amendment to the Act of 1835,[14] and held that the 1835 act as amended was "equal and uniform throughout the state." The basis for this holding was that all lenders could bring themselves within its provisions. The Court pointed out that "[a]fter the passage of the Act of 1860, as before its passage, there was but one equal and uniform rate of interest . . . which was six per cent. per annum." But, said the Court, under the 1860 act "it was made lawful for any person . . . to take more or less than the legal rate of interest. . . . ." 42 Tenn. at 389.

---

14. The 1860 Act contains no specific repealing clause.

This opinion had serious repercussions and contributed to the action of the 1870 Convention.[15]

### f. Summary.

█ The Constitution of 1834 left the rate of interest to the judgment and discretion of the legislature. The object of Article 11, section 6 of that constitution requiring that the rate of interest "be uniform throughout the state" was to "inhibit the Legislature from granting the banking corporations the privilege of taking a greater rate of interest than was allowed to individuals". *Perkins v. Watson,* 61 Tenn. at 172, 177 (1872). Real transaction paper might be discounted at a rate in excess of the legal rate but notes made for the purpose of raising money might not. *May v. Campbell, supra.* There could be no valid law authorizing banks to discount at a rate in excess of the legal rate, except where the charter predated the Constitution of 1834. *Hazen v. Union Bank of Tennessee, supra.* The practice of discounting notes was prevalent during the period; however, we find no case approving the practice where the note or other indicia of debt were executed for the purpose of raising money.

The discounting of notes became a matter of public concern and this led to the appointment of a Joint Legislative Committee. The Committee reported that the going rate of interest was in excess of the legal rate, ranging between fifteen and twenty-five per cent, and that our interest rates were driving capital from the state to the detriment of our economy. The Committee recommended a conventional interest law that was adopted by the legislature, stayed in effect five months and then was repealed. In the meantime, its constitutionality was upheld in *Caruthers v. Andrews, supra.*

The case law decided under the Constitution of 1834 must be given great weight in construing the provisions of Article 11, Section 7 of our present constitution.

### IV.

### *The Constitution of 1870*

The political background is relevant and significant.[16]

---

15. See Sec. IV, *infra.*

16. Tennessee, torn by war and devastation, suffered under the despotic, tyrannical, and dictatorial regime of William G. "Parson" Brownlow from April 1865 until April 1869—four long years. As the guiding genius of a subservient legislature he "not only disfranchised the overwhelming majority of Tennessee's citizens, but pursued them constantly with additional hostile legislation." See 5 R. White, Messages of the Governors of Tennessee, 395 (1959). He was vicious, vindictive, coarse, and vulgar, his avocation as a minister of the gospel to the contrary notwithstanding.

The ruthless regime of the Radicals in Tennessee is well documented. *Id.* at 373–390. In no area was this more evident than in the Arnell law, Chapter 16, Acts of 1865, an iniquitous, disfranchising act operating to deny suffrage to all but a privileged few. Laska, A Legal and Constitutional History of Tennessee, 6 Memphis State L.Rev. 563, 628–629 (1976).

The Parson appointed the members of the Supreme Court in the face of the statutory requirement that they be elected. 5 R. White Messages of the Governors of Tennessee 576,

596 (1959); Id., vol. 6, p. 8. It was this Court that decided *Caruthers v. Andrews, supra.* No doubt this Court was convicted of guilt by association, but the fact remains that its decisions, as reported in Volumes 41–47, Tennessee Reports were designated by contemporary lawyers as "Coldwell's Fables." Green, The Supreme Court of Tennessee in 1878, 16 Tenn.L. Rev. 767, 768–69 (1941).

Upon Parson Brownlow's election to the United States Senate, he was succeeded by DeWitt Clinton Senter, the Speaker of the Senate. 6 R. White, Messages of the Governors of Tennessee 1 (1963). Senter soon broke with the Radical faction, removed the majority of Brownlow's election commissioners, and appointed Conservatives in their stead. After what has been characterized as "perhaps the most bitterly fought gubernatorial contest ever waged in the Volunteer State", he was re-elected in 1869 in an election open to all citizens. Along with him was elected a Democratic Legislature. During the campaign, Governor Senter had called for a constitutional convention. This election broke the strangle hold of the Radicals. Ibid. 2, 3.

a. *Background and contemporaneous events.*

The legislature convened in Nashville on October 4, 1869. It acted with dispatch. It adopted a resolution [17] on November 15, 1869, submitting the question of calling a convention to a vote of the people in a special election to be held on December 18, 1869. The election was conducted, delegates selected, and thereafter the convention met on January 10, 1870, in the Davidson County Courthouse in Nashville.[18] We presume the courthouse was selected as the convention site in view of the fact that the legislature was in simultaneous session during the entire course of the convention.

The basic and underlying purpose of the convention was the restoration of the citizenship of thousands of Tennesseans disqualified under Parson Brownlow's franchise acts.[19] Notwithstanding the emotionally charged political atmosphere, this convention was marked by restraint. In fact, it has been said that "the true policy was to do as little as possible."[20] Delegate A. O. P. Nicholson, later Chief Justice of this Court, sounded the key-note:

Let us be careful; let us do no more than is absolutely necessary. In ten years from now all this must be done again.[21]

There seems to be a unanimity among historians that this convention of seventy-five Tennesseans "was, probably, the most intellectual body of men ever assembled in Tennessee for any purpose."[22]

Major General John C. Brown, of Giles County, who served as governor from 1871 to 1875, was elected as chairman. His older brother, former Governor Neill S. Brown, was an influential member of the convention. David M. Key, who succeeded Andrew Johnson in the United States Senate, served as Postmaster-General under President Hayes, and became a United States District Judge in 1800, was another outstanding member of the convention. Other distinguished members included future Governor James D. Porter, Joseph B. Heiskell, a former member of the Confederate Congress and afterwards Attorney General of Tennessee (See Volumes 48–59, Tennessee Reports); and Chancellor Henry R. Gibson, famed author of Gibson's, Suits in Chancery.

The most distinguished delegate was probably A. O. P. Nicholson. He served in the Senate of the United States and as the first Chief Justice under the Constitution of 1870.

Such was the leadership of the 1870 Convention. While the primary purpose of that convention was political and few changes of major importance were made in the Constitution of 1834, a significant change was made in the constitutional provision relating to interest. The conventional interest law of 1859–1860 had been repealed, but conventional interest continued as a critical issue.

On November 4, 1869, after the introduction of a bill to establish a conventional rate of interest, Representative R. B. Cheatham addressed the House of Representatives. His remarks are reported verbatim in the November 5, 1869 issue, of the *Nashville Union and American,* page 1, and constitute a most forceful argument in favor of the law. We quote a portion:

17. Chapter 105, Acts of 1869.

18. Nashville Union and American, January 11, 1870, page 1.

19. J. Caldwell, Constitutional History of Tennessee 296 (1907); 1 J. Moore, Tennessee, the Volunteer State 552 (1923).

20. J. Caldwell, Constitutional History of Tennessee 299–300 (1907).

21. Ibid, 300.

22. J. Caldwell, Constitutional History of Tennessee 298 (1907); 1 J. Moore, Tennessee, the Volunteer State 551 (1923); 6 R. White, Messages of the Governors of Tennessee 84 (1963); Laska, A Legal and Constitutional History of Tennessee, 6 Memphis State L.Rev. 563, 635 (1976).

. . . *Money is worth in the market whatever it will bring.* Laws saying it shall only be worth six per cent. do not fix its price; and no licensing or penal regulations can govern the price, or restrain the sale at whatever price it may bring. . . .

It is evident that our laws prohibiting money to be loaned, and contracts to be made at any higher rate of interest than six per cent. has been for years, and is still, not only preventing foreign capital from coming into Tennessee, but has driven out, and is continually driving millions of our capital into other States with more liberal laws, and forcing it into investments which are non producing. Money to-day in our own midst, and in every State surrounding us, is worth from 8 to 12 per cent. per annum, and is so recognized by all classes. The farmer, the trader, the manufacturer cannot get it at 6 per cent., the price fixed by law. They have ceased to expect it. They do not ask it. Being unable to borrow it from private individuals or from estates of any kind on any kind of security, on account of the usury laws as they exist, they are forced to go into the bank on paper inconveniently short, or to go to *shavers* who are compelled, on account of these same laws, to exact exorbitant rates.

This argument, like the Joint Committee report of 1859, has a familiar ring and one that continues to be sounded today. Representative Sadler of Robertson County addressed the House of Representatives in opposition to the bill. His remarks are reported on page 1, *Nashville Union and American,* November 27, 1869. In obvious reference to *Caruthers v. Andrews, supra,* Mr. Sadler said:

I am aware of a decision of the Supreme Court on the old ten per cent. law that has been acknowledged by an eminent lawyer in this house to be at least a doubtful decision, and there is no good lawyer but will acknowledge, when we have a strong bench, this decision may be reversed.

On December 4, 1869, the *Nashville Union and American* published an editorial endorsing the conventional interest law. After reviewing the report of the Joint Committee of the 1859–1860 legislature, the editorial reads:

What was true of this State ten years ago, is equally so to-day. Money is worth more than six per cent, not only in Tennessee but in every State of the Union. . . .

Again, on February 6, 1870, the *Nashville Union and American* editorially urged passage of the conventional interest law. The editorial recognizes the argument that a conventional interest law is unconstitutional and counters it by extensive quotation from *Caruthers v. Andrews, supra.*

Thus, it appears that conventional interest was extensively debated prior to and during the time the Constitutional Convention and the legislature were deliberating.

b. *The proceedings.*

We have examined the Journal of the Constitutional Convention of 1870 in an effort to determine the intent of the convention. The matter of interest rates was the subject of many motions.

On February 21, the Journal reflects that the Convention adopted Article 11, Sec. 6 "as amended, giving the Legislature power to pass a conventional rate of interest not to exceed ten per centum per annum." [23] This operated to complete the formulation of the present provision.

On Wednesday morning, February 23, 1870, the Convention proceeded in a body

23. Journal of Constitutional Convention of 1870, page 386.

and presented the enrolled copy of the Constitution to the Governor.[24]

In its final form Article 11, Section 7, read as follows:

The Legislature shall fix the rate of interest, and the rate so established shall be equal and uniform throughout the State; but the Legislature may provide for a conventional rate of interest, not to exceed ten per cent. per annum.[25]

In summary, it appears from the proceedings of the Convention that the delegates, in order:

a. *rejected* an amendment giving the legislature the power to fix a conventional rate of interest;

b. *rejected* an amendment authorizing a rate of ten per cent for loaned money;

c. *rejected* an amendment fixing a legal rate of interest at 6 per cent with the legislature fixing a conventional rate;

d. *rejected* a committee report containing a proposed section under which the rate was fixed at 6 per cent but made lawful any rate agreed upon by the parties, inserted in a written contract, not to exceed 10 per cent;

e. *adopted* Article 11, section 6, Constitution of 1834 (the first clause of Article 11, section 7, Constitution of 1870);

f. *adopted* an amendment: "but the Legislature may provide for a conventional rate of interest";

g. *adopted* an amendment providing that the Legislature shall have no power to enact any law allowing a higher rate of interest than ten per cent. per annum"; and

h. *adopted* an amendment giving the legislature power to pass a conventional rate of interest not to exceed ten per cent.

These proceedings, in orderly progression, combined to produce the final version of Article 11, section 7 of the Constitution.

c. *Analysis.*

■ We think that the language used, in the context of the statutory and decisional law, public debates, and public documents, leading up to its adoption compels these conclusions:

a. The legislature *must* fix a rate of interest.

b. The rate so fixed *must* be equal and uniform throughout the state.

c. The legislature *may* provide for a conventional rate of interest.

d. A conventional rate of interest *must not* exceed ten per cent.

All legislative enactments must yield to this, our basic charter, and must be tested against these plain provisions. Statutory enactments relating to usury are of only passing relevance. The Constitution contains no provision against usury except that which is implicit in the second clause of Article 11, section 7.

■ We set to rest, at this point, the suggestion so often heard that our Constitution fixes a ten per cent limitation on interest. This is a misconception. The legislature, under the first clause of Article 11, section 7, may fix *any legal* rate of interest it deems proper. It is not required to fix a *conventional* rate. We point out that no part of Article 11, section 7, is self-executing.

If, however, the legislature elects to fix a conventional rate of interest it is limited to ten per cent.

Our Constitution contains the conventional interest clause and the phrase "conven-

**24.** Id. at 406, 440.

**25.** Id. at 436.

tional interest" had a particularized legal significance in 1870 and that meaning has not changed. See *supra*, Sec. III e. Again, the distinction between conventional and legal rates of interest is crucial.

We recognize the insistence that the insertion of a fixed limitation in a constitution or other basic charter, and thus constitutionalizing with fixed rigidity, matters better left to statutory flexibility, violates recognized principles. Indeed, this has been said to be "the chief criticism of the 1870 Constitution by most scholars." [26]

This contention harmonizes with Justice Cardozo's statement in *The Nature of the Judicial Process*, 83 (1921), that "a constitution states or ought to state not rules for the passing hour but principles for an expanding future." Thus, under this view it is the duty of a constitutional convention to achieve a balance between the demands of stability and the need for change.

Be this as it may, the second clause of Article 11, section 7 is in our Constitution. Its meaning is plain; our duty is clear. We shall enforce it.

### V.

#### *Our second conventional interest law*

We have seen that during the entire Convention of 1870 the General Assembly was in simultaneous session. Two days after the Convention finalized its action on Article 11, section 7 and on February 23, 1870, the very day and date the finished Constitution was presented to the Governor, the Legislature adopted our second conventional interest law, Chapter 69, Public Acts of 1869–1870.

Section 1 provided that "it shall be lawful to contract for any rate of interest not exceeding ten per cent. per annum, provided that the rate of interest be in writing and expressed in the face of the instrument. . . ."

Section 2 provided:
That the rate of interest now established by law shall continue equal and uniform throughout the State as heretofore, and no greater rate of interest than six per cent. per annum shall be received on any contract or obligation, unless agreed on by the parties, and reduced to writing in the face of the contract or obligation, according to the provisions of the first section of this Act.

This Act was repealed by Chapter 21 of the Acts of 1877, with the result that the Act of 1835, as codified in the Code of 1858 was again effective.

### VI.

#### *Decisional law since 1870*

Cases decided under the Constitution of 1870 add no dimension to earlier cases decided under the Constitution of 1834 and/or statutes governing conventional interest. Some, however, are relevant, and because able counsel urge differing construction, we note those we consider to be most significant.

Counsel for Cumberland Capital relies upon *Chafin v. Lincoln Savings Bank*, 54 Tenn. 499 (1872), opinion by Chief Justice Nicholson, aptly described in brief as "one of the chief architects and builders of the constitution of 1870" (quoting 113 Tenn. at 736). Counsel relies upon this opinion as "approving discounting at the legally permissible rate." We cannot accept the implications of this construction.

In *Chafin* the facts were that the bank had discounted, at a rate of 15 per cent, a note that was made for the purpose of raising money. The Court held that the fact that the note was made to be sold for the purpose of raising money, and that the

---

**26.** Laska, Legal and Constitutional History of Tennessee, 6 Memphis State L.Rev. 563, 635 (1976).

bank knew this, made the transaction illegal and usurious. The Court said, in pertinent part:

Although in strictness the term "discount of notes," originally meant the purchase of real transaction notes, as contradistinguished from mere accommodation notes, yet in practice the distinction has been too long disregarded, and has been too often ignored in our legislation, to be now made the ground of a judicial decision. The lending of money is one of the legitimate franchises of a bank, and it exercises this privilege when it discounts a note which it knows was made for the purpose of raising money. The bank lends its money and takes the note of the borrower as security for its repayment. If the loan is made at a rate of interest or discount not exceeding 6 per cent., the transaction is legitimate. *If the note was discounted, or the loan made at a greater rate than 6 per cent., the transaction is illegal and usurious. . . .* (Emphasis supplied). 54 Tenn. at 501–502.

We read nothing in this opinion that would validate any discounting that would result in a rate of interest in excess of the constitutional or statutory limit. The construction contended for by Cumberland, would not only be at variance with the constitutional limitation, it would nullify its own meaning.

It is true, as contended by Cumberland, that the Court held in *Crowley v. Kolsky,* 57 S.W. 386 (Tenn.Ch.App.1900) that a lender has a "right to deduct legal interest until the maturity of the note,—that is to exact prepayment of legal interest . . . ."

We do not regard this as a precisely correct statement of the law. It is correct if, but only if, two criteria are met. First the repayment must be on an annual basis and secondly, the rate must be less than 10%. This follows from the fact that a note in the sum of $100.00, payable at the end of the

year, when discounted at the rate of ten per cent, gives the borrower a net of $90.00. For the use of that for one year he pays approximately 11.1% interest and this rate, therefore is constitutionally impermissible. For further computations see Appendix.

Cumberland contends that *Caldwell & Co. v. Lea,* 152 Tenn. 48, 272 S.W. 715 (1924) "must be considered as the single most authoritative pronouncement on the meaning and scope of Article XI, section 7." While we agree that the opinion is authoritative, we are not impressed that it is supportive of Cumberland's position.

*Caldwell* arose under Chapter 69 of the Acts of 1925 authorizing corporations, firms and individuals to issue bonds or notes aggregating $50,000.00 or more at a rate not to exceed seven and one half (7½%) per cent. The Court held the act to be constitutional.

The opinion points out that Section 7 of Article 11 of the Constitution "except requiring the legislature to fix an interest rate adds nothing to section 8 of article 1 [law of the land], and section 8 of article 11 [class legislation], of the present constitution." 152 Tenn. at 52, 272 S.W. at 716. Then, the Court said:

We may lay aside so much of section 7 of article 11 as authorizes the legislature to provide for a conventional rate of interest. 152 Tenn. at 52, 272 S.W. at 716.

Next, the Court notes the provisions of Article 11, section 6 of the Constitution of 1834, and cites *Caruthers, supra,* and *McGhee v. Trotter,* 48 Tenn. 453, as being two cases wherein the Court held "that the legislature was empowered to fix a contract rate . . . not exceeding ten per cent. was valid." Id. These two cases were decided under our first conventional interest law (Ch. 41, Acts of 1859–60).

Thus, the Court reaches the *only* question in the lawsuit, viz whether the classification made in the Act of 1925 was reasonable. The Court responded in the affirmative. In

so doing the language of the opinion by Justice Green is most significant.

> The object of the provision of section 6 of article 11 of the Constitution of 1834, carried into section 7 of article 11 of the Constitution of 1870 that the interest rate should be equal and uniform was to *cut off the grant of charter powers to banks and moneyed institutions to exact a greater rate than individual lenders were permitted to obtain.*" (Emphasis supplied). 152 Tenn. at 53, 272 S.W. at 716.

The derivation and the background of the first clause of Sec. 7, Art. 11 is explained as follows:

> Under section 7 of article 11 of the Constitution of 1834 the legislature was authorized "to grant such charters of corporation as they might deem expedient for the public good." The legislature had been empowering banks by their charters to *contract* for a special rate of interest, and section 7, just quoted apparently authorized a continuance of this practice. Section 6 of the Constitution of 1834 [now sec. 7, art. 11] was adopted to prevent the grant of any special power of this sort. (Emphasis supplied). Id. at 54, 272 S.W. at 716.

In the meantime, in 1921 the legislature adopted our third conventional interest law. See Chapter 28, Acts of 1921. It was repealed by Chapter 5, Acts of 1923. Again, the Act of 1835, as codified in the Code of 1858, became operative.

The record suggests that Tennesseans cannot live with a conventional interest law and cannot live without one.

The constitutionality of the 1925 Small Loan Act (Ch. 69, Acts of 1925) was upheld in *Koen v. State*, 162 Tenn. 573, 39 S.W.2d 283 (1931). This act fixed the interest charge at six per cent. This case was primarily concerned with service fees and is discussed *infra*.

In *Dowler v. Ga. Enterprises, Inc.*, 162 Tenn. 59, 34 S.W.2d 445 (1931), the Court held (1) that partial payments on interest bearing obligations must be applied first to interest and second to principal; (2) that this rule "may be varied by contract if it does not savor of usury", 162 Tenn. at 63, 34 S.W.2d at 446; (3) that in interest computation a year is 365 days; and (4) that shortening the year to 360 days results in usury.

*Rush v. Dupont Emp. Cr. Union*, 210 Tenn. 344, 358 S.W.2d 333 (1962), arose under the credit union statutes, Sec. 45–1801 et seq. T.C.A. Section 45–1820 authorizes a credit union to lend to its members "at a rate of interest not in excess of the legal rate, and the total interest and all other charges for a loan shall not exceed one per cent (1%) per month on the unpaid balance . . . ." Citing Sec. 47–1604 (now 47–14–104) T.C.A. fixing the rate of interest at 6%, the Court held a note payable "with interest on unpaid balance at the rate of one per cent per month" was usurious on its face and unenforceable. The Court declined to permit the introduction of parol evidence to show that the word "interest" as used in the note included "all other charges."

## VII.

### *The Industrial Loan & Thrift Act*

Industrial Loan and Thrift Companies have their Tennessee origin in Chapter 226, Public Acts of 1951. We are concerned only with those portions of the original and amendatory acts as relate to interest. Initially, in this respect, the act simply authorized such companies:

> To lend money on the personal undertaking of a borrower or other persons, with or without security including certificates of indebtedness or investment purchased by the borrower simultaneously with the said loan transaction, or otherwise, and to deduct interest in advance on the face amount of the loan for the full term

thereof.[27]   See Sec. 45–2007(f) (Main vol. 8)

While the act was in this posture there came before the United States District Court for the Western District of Tennessee the case of *In Re Bogan*, 281 F.Supp. 242 (W.D.Tenn.1968). The question presented was whether a note forming the basis of a Loan and Thrift Company bankruptcy claim was usurious. The debtor signed a note for $612.00, received the use of $556.08 and agreed to repay at the rate of $34.00 per month, for a period of 18 months. The Court held this to be interest at the rate of approximately 12 per cent per annum.[28]

Judge McRae's opinion contains the following significant language:

> It should be noted that this court does not consider that it was called upon to determine the constitutionality of the Industrial Loan and Thrift Act; nor does it intend to hold that any portion thereof is violative of the Constitution of the State of Tennessee. The Court does hold that the Act must be interpreted to be limited by Article 11, Section 7 of the Constitution of Tennessee. The Court, therefore, finds in the instant case that the claim note was usurious on its face because it shows that the interest provided was in excess of the constitutional maximum. 281 F.Supp. at 248.

After *In Re Bogan* was decided, the legislature adopted Chapter 466 of the Public Acts of 1968, relating to refunds and refund credits. Then, by Chapter 260, Acts of 1969, Sec. 45–2007(f) was put in its present form. In pertinent part, it now reads as follows:

> To lend money on the personal undertaking of a borrower or other persons, with or without security including certificates of indebtedness or investment purchased by the borrower simultaneously with the said loan transaction, or otherwise, and to

*deduct interest at a rate not in excess of 7½% per annum, in advance on the face amount of the loan for the full term thereof.* (Emphasis supplied).

The constitutionality of this portion of the act is the basic issue before the Court.

## VIII.

### *Constitutionality of Sec. 45–2007(f)*

■   Sec. 45–2007(f), T.C.A. must be construed to provide for a conventional rate of interest. This construction is a necessary consequence of the conclusion that conventional interest arises by contract and is an agreed rate. That this was the evident intent of the legislature may be gleaned from the fact that Section 47–14–104, T.C.A., the general law regulating interest fixes both a legal and a conventional rate and excepts Industrial Loan and Thrift Companies from the application of the conventional interest provision. Chapter 61, Acts of 1969 became effective April 10, 1969, twenty-five days *before* the effective date of Chapter 260 of the Acts of 1969 amending the Industrial Loan and Thrift Act. The latter act specifically regulates the rate of interest charged by Industrial Loan and Thrift Companies, and, as the latest, and as a specific act, it would supersede all others.

Section 45–2007(f) must, therefore, be tested against Article 11, Section 7 of the Constitution. If it provides for an interest rate within the ten per cent constitutional limitation on conventional interest, it is constitutional; but if the rate provided results in a yield in excess of ten per cent it is unconstitutional and void.

■   Section 45–2007(f) expressly authorizes Industrial Loan and Thrift Companies "to deduct interest at a rate not *in* excess of *seven and one-half per cent (7½%)* per an-

---

27. The interest rate was governed by Sec. 47–14–104, the general statute, fixing the rate of interest, as it existed at that time.

28. Actually, the rate was 12.7%. See Appendix.

num, *in advance* on the face amount of the loan for the full term thereof." This is discounting in its purest form. But this fact, standing alone does not render the act unconstitutional. This determination rests upon mathematical computations.

The notes involved in this litigation were, in legal effect, monthly installment obligations, discounted in advance. In the Appendix we have made calculations showing the effective interest rate upon the advance discounting of such installment loans.

■ The inescapable result of these computations is that Section 1 of Chapter 260 of the Public Acts of 1969, which appears in the Code Supplement as Sec. 45–2007(f) is unconstitutional and void, insofar as it is applied to any note or obligation, discounted at 7½% per centum and payable in monthly installments, or to any other transaction, regardless of how payment is programmed, if the end result is an effective rate of interest in excess of ten per cent.

## IX.

### *The applicable interest rate*

The question now arises as to what rate of interest the notes in litigation should bear.

The trial judge held that the interest on the various loans should be computed "at ten per centum per annum, giving proper credit for loans paid in advance either by money, refinancing or foreclosure." This conclusion is not entirely correct.

There is no specific legal sanction for permitting an Industrial Loan and Thrift Company to exact an interest charge of ten per cent. Section 47–14–104, T.C.A. authorizing a ten per cent conventional interest shows on its face that that interest rate does not apply to Industrial Loan and Thrift Companies. Sec. 45–2007(f) authorizes these companies to deduct interest of up to seven and one-half per cent in advance. We have demonstrated that this operates to produce a rate in excess of ten per cent on installment obligations.

■ We hold that the declaration of the limited unconstitutionality of Sec. 45–2007(f), T.C.A., operates to restrict Industrial Loan and Thrift Companies to a maximum effective rate of interest, irrespective of the manner of payment, of ten per cent, the constitutionally permissible maximum.

■ On remand interest will be computed on a 7½ per cent discount basis with the qualification that the effective rate of interest shall not exceed ten per cent. The trial judge will bear in mind that the inquiry must be directed at what the lender will receive and not what the borrower will pay. The trial judge is admonished that all proper credits be given to the respective parties.

In view of the disposition we have made we do not deem it necessary to discuss the facts and figures with respect to any of the loans involved. The trial judge has indicated that these complex matters would be referred to a special master. We approve this procedure. We point out that our use of the constant ratio formula in the Appendix is only for purpose of analysis and demonstration. On remand, inquiry should be made, and proof should be taken, as to other methods of computation and the trial court, based thereon, may make a proper determination.

## X.

### *Service Charges and Maintenance Fees*

Technically, we perhaps have responded to the two questions certified; however, question number one is sufficiently broad to cover all pertinent portions of Sec. 45–2007, T.C.A. We note appellant's assignment VII, which reads as follows:

The Circuit Court erred in failing to hold that Section 45–2007(i), (p) and (q), in defining and regulating service charges and maintenance fees . . . is constitutional.

We elect to respond to this assignment because we think it fairly within the purview of question one; further, it is necessary that we treat with this insistence for the guidance of the trial judge on remand. This Court has addressed this matter in numerous reported cases, from which these rules emerge:

■ 1. The Legislature may not authorize a lender to arbitrarily fix a monthly expense fee. *Koen v. State*, 162 Tenn. 573, 39 S.W.2d 283 (1931); *Personal Fin. Co. v. Hammack*, 163 Tenn. 641, 45 S.W.2d 528 (1932), nor to charge all borrowers the maximum fee, in addition to interest. *Family Loan v. Hickerson*, 168 Tenn. 36, 73 S.W.2d 694 (1934).

■ 2. The lender and the borrower are free to agree upon a reasonable service charge within the statutory limit, *Koen v. State, supra*; but this "freedom of contract" is limited by Article 11, Section 7 relating to conventional interest, *Pugh v. Hermitage Loan Co.*, 167 Tenn. 389, 70 S.W.2d 22 (1934), and is further limited and governed by other principles set forth in this sequence.

■ 3. Service charges must bear a reasonable relation to the expense and service of the lender. *Pugh v. Hermitage Loan Co., supra.*

■ 4. When the service charge is within the statutory limits it is *prima facie* valid, and the burden is on the borrower to show by a preponderance of the evidence that the charge does not bear a reasonable relation to expenses and services. *Family Loan Co. v. Hickerson, supra.* When the borrower makes out a *prima facie* case, the burden shifts to the lender. *Golightly v. Hermitage Loan Co.*, 171 Tenn. 70, 100 S.W.2d 654 (1937). The burden is on the borrower to show that the loan is usurious. *Williams v. Personal Finance Co.*, 172 Tenn. 69, 109 S.W.2d 1166 (1937).

■ 5. The service charge amounts to usury if exacted as additional compensation for the use of money in attempted evasion of the statutes against usury. *Pugh v. Hermitage Loan Co., supra.*

■ 6. The service charge may not include overhead expenses such as rents, salaries and loan losses, *Family Loan Co. v. Hickerson, supra*, but this does not preclude charging for services directly related to the loan rendered by salaried employees. It only excludes indirect or extraneous expense. *Williams v. Personal Finance Co., supra.*

As we said in *Aztec Prop. v. Union Planters Nat. Bank, etc.*, 530 S.W.2d 756 (Tenn. 1975):

> Interest includes *all* compensation for the use of money. "Any payment to the lender in addition to the rate of interest legally permissible, whether called by the name of bonus or commission *or by any other name*, is usurious." (Emphasis supplied). 530 S.W.2d at 757.

■ We hold that any service charge in excess of the fair and reasonable worth of expense and service attributable directly to a loan must be treated as additional compensation to the lender and constitutes interest. Any such excess must be added to the stated, or resulting, amount of interest in order to determine the validity of the charge. The excess, of course, is conventional interest.

Installment maintenance fees, as set forth in Sec. 45–2007(h) are to be governed by the same rules.

We do not hold Sections 45–2007(i) or (p) to be unconstitutional. We do hold, that, in order to sustain the constitutionality of these sub-sections, they must be construed and interpreted as hereinabove set forth, and not as established, uniform, fixed, rigid or arbitrary charges, the provisions of subsection (q) to the contrary notwithstanding.

See *Family Loan Co. v. Hickerson, supra,* 168 Tenn. at 42, 73 S.W.2d 694 and *Pugh v. Hermitage Loan Co., supra.*

We do not test legislative enactments by our conception of morality or merit. Our sole duty is to insure that legislation complies with the mandates of our Constitution. Nor are we privileged to sit in judgment on the merits of constitutional provisions. We may only construe and abide them and mandate that they be respected.

Modified, Affirmed and Remanded.

COOPER, C. J., and FONES, BROCK and HARBISON, JJ., concur.

## ADDENDUM

Tax all costs against Cumberland Capital.

## APPENDIX

For purposes of these computations we will assume a loan of $100.00, bearing interest at the rate of 7½%. If this loan is discounted in advance and is payable at the end of one year, the resulting yield is approximately 8.00 per cent, which is constitutionally permissible. If it is payable monthly, and on a declining balance basis it is not constitutionally infirm. But discounted or add-on interest, payable in installments, present an entirely different result.

There are a number of different methods for the computation of interest rate or yield.[1] We have elected to use the "uniform" or "constant" ratio method, because of its simplicity and accuracy. This method assumes that the allocation of the charge is proportional to the number of periodic payments, with the result that each periodic payment reduces the charge by constant amount and the principal by another constant amount.[2]

This formula[3] is

$$ i = \frac{2mD}{P(n+1)} $$

in which $i$ = rate of charge (effective rate)
$m$ = number of payment periods in one year
$n$ = number of payments to discharge the debt
$D$ = charge in dollars
$P$ = principal

We apply this formula to a loan having a face value of $100.00 with discount at the rate of 7½% payable in twelve equal monthly installments. The borrower was tendered $92.50 at the time of the loan. This tabulation shows the resulting rate of interest:

$$ i = \frac{2 \times 12 \times 7.50}{92.50 \times (12+1)} = \frac{180.00}{1202.50} = .14968 = 14.97\% \text{ interest.} $$

Using the same formula, we demonstrate its application in the case of a loan having a face value of $100.00 at an *add-on* interest rate of 7½% payable in twelve equal monthly installments:

$$ i = \frac{2 \times 12 \times 7.50}{100 \times (12+1)} = \frac{180}{1300} = .13846 = 13.85\% \text{ interest.} $$

By a further example, we show that a 7½% annual *discount* rate on a note of $100.00 payable in four equal monthly installments results in a somewhat lower effective rate:

$$ i = \frac{2 \times 12 \times (7.50 \times 4/12)}{[100 - (7.50 \times 4/12)][4+1]} = \frac{60}{487.50} = .12307 = 12.31\% \text{ interest} $$

In this example note that the value for "m" remains the same as in previous examples since the frequency of payment is the same; the value for "n", however, reflects the shorter period of this loan.

By final example we show the cost rate by the constant ratio method for a balloon note. The formula, as set forth in M. Nei-

---

1. Technically, interest is the charge expressed as a percentage paid by the borrower, while yield is the rate of return to the lender. M. Ayres, Installment Mathematics Handbook 107 (1946).

2. M. Neifeld's Guide to Installment Computations 193 (1951); Thorndike, Encyclopedia of Banking and Financial Tables Sec. 16 (1973).

3. Id. at 195.

feld's Guide to Installment Computations 207 (1951), is:

$$i = \frac{2mAD}{Pn(A + L)}$$

in which
D = charge in dollars
P = principal or cash advance
A = P + D = face of the note
m = number of payment periods in one year
n = number of payments to discharge the debt
i = rate of charge
L = final or balloon payment

We apply this formula to one of the transactions in the instant controversy where the indebtedness was $70,629.87 payable in 35 monthly installments of $1,600.00 with a final or balloon payment of $14,629.87, with interest of $15,883.62 and finance charge of $380.60 deducted in advance. The computation is as follows:

(using total charge)

$$i = \frac{2 \times 12 \times 70,629.87 \times 16,300.22}{54,329.65 \times 36(70,629.87 + 14,629.87)} = 16.569$$

(using interest only)

$$i = \frac{2 \times 12 \times 70,629.87 \times 15,883.62}{54,329.65 \times 36 (70,629.87 + 1,462.87)} = 16.146$$

The annual percentage rate entered by Cumberland Capital was 15.25, computed according to Regulation Z. We do not fault this computation. Irrespective of the formula or method there will be a slight variation.

The following chart on effective interest rates demonstrates the results of discounts and add-ons at various interest rates calculated by the formula first given above.

Effective Interest Rates
on Loans Paid in Monthly
Installments

| Length of loan in months | 6% Discount | 6% Add-on | 7 1/2% Discount | 7 1/2% Add-on | 10% Discount | 10% Add-on |
|---|---|---|---|---|---|---|
| 1 | 6.03 | 6.00 | 7.55 | 7.50 | 10.08 | 10.00 |
| 2 | 8.08 | 8.00 | 10.13 | 10.00 | 13.56 | 13.33 |
| 3 | 9.14 | 9.00 | 11.46 | 11.25 | 15.38 | 15.00 |
| 4 | 9.80 | 9.60 | 12.31 | 12.00 | 16.55 | 16.00 |
| 5 | 10.26 | 10.00 | 12.90 | 12.50 | 17.39 | 16.67 |
| 6 | 10.60 | 10.29 | 13.36 | 12.86 | 18.05 | 17.14 |
| 7 | 10.88 | 10.50 | 13.73 | 13.13 | 18.58 | 17.50 |
| 8 | 11.11 | 10.67 | 14.04 | 13.33 | 19.05 | 17.78 |
| 9 | 11.31 | 10.80 | 14.30 | 13.50 | 19.46 | 18.00 |
| 10 | 11.48 | 10.91 | 14.55 | 13.64 | 19.83 | 18.18 |
| 11 | 11.64 | 11.00 | 14.77 | 13.75 | 20.18 | 18.33 |
| 12 | 11.78 | 11.08 | 14.97 | 13.85 | 20.51 | 18.46 |

Note: In each case a loan for the number of months indicated at any point below the underscoring is usurious.

OPINION ON PETITION TO REHEAR

Cumberland Capital[1] has filed an elaborate petition to rehear taking exceptions to the holding of the Court and rearguing the issues. Additionally it invokes the due process clause of the Fourteenth Amendment to the Constitution of the United States, as well as the "commerce clause" (article I, section 8, clause 3).

Petitioners, in their zeal, seemingly have overlooked that this matter came before us on interlocutory appeal. The jurisdiction of

1. An Indiana corporation, erroneously identified in our opinion as a Tennessee corporation.

this Court was invoked under Sec. 27–305, T.C.A., upon the basis that it involved "a controlling question of law as to which there is substantial ground for difference of opinion." Two questions were certified, viz.:

1. Are the terms of Tennessee Code Annotated Section 45–2007 violative of Article XI, Section 7 of the Constitution of the State of Tennessee? [2]

2. [If so] is the original complainant entitled to a computation of interest at the rate prescribed by Article XI, Section 7 of the Constitution of the State of Tennessee?

We elected to take jurisdiction of the appeal and answered both questions fully and finally. Further comment upon the various ramifications of the opinion is improper and would be sheer dicta. It is unfortunate that the nature of the appeal and the established principles of appellate review have combined to produce a narrow consideration of limited issues resulting in many questions, the resolution of which is not before this Court. We cannot give advisory opinions.

Our resolution of the issues thus presented came as a result of painstaking research, intensive study and intra-court conferences, during which all phases of the controversy were vigorously debated and discussed. The finished product represents the considered judgment of this Court. Further consideration would serve no useful purpose. We, therefore, overrule, without extended discussion, and as without merit, all questions presented except that relating to the single issue of retroactive versus prospective application.

The leading case on the subject of the prospective application of decisional law is *Great Northern Ry. Co. v. Sunburst Oil & Ref. Co.*, 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932). Justice Cardozo's discussion of this issue has come to be known as the "Sunburst" doctrine or technique:

A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward. It may say that decisions of its highest court, though later overruled, are law none the less for intermediate transactions. Indeed there are cases intimating, too broadly (citations omitted) that it *must* give them that effect; but never has doubt been expressed that it *may* so treat them if it pleases, whenever injustice or hardship will thereby be averted. (Emphasis in original). 287 U.S. at 364, 53 S.Ct. at 148.

In *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), the Court makes it clear that:

. . . the accepted rule today is that in appropriate cases the Court may in the interest of justice make the rule prospective. 381 U.S. at 628, 85 S.Ct. at 1737.

We think it beyond doubt that this Court, acting in its judgment and discretion, and within the framework of established legal principles, may apply the holding of the instant case either retroactively or prospectively.

Vigorously competing principles of law are involved. Petitioner urges a rule of complete prospective application based on the "presumption of validity" theory, while respondents urge the application of the "void *ab initio*" doctrine. A discussion of these legal principles is appropriate.

Under the "void *ab initio*" approach the statute is given no effect and treated as though it never existed, whereas under the "presumption of validity" approach, it must be presumed valid until invalidated by a court of competent jurisdiction. The progenitor of the "void *ab initio*" approach in American jurisprudence is *Norton v. Shelby County*, 118 U.S. 425, 442, 6 S.Ct. 1121, 1125, 30 L.Ed. 178 (1886), wherein the Court formulated the theory thusly:

An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inop-

2. No issue was presented under the Federal Constitution.

erative as though it had never been passed.

The Supreme Court of the United States, however, has retreated, at least partially, from this broad formulation where necessary to achieve a more equitable or practical result.

It was first questioned in *Chicot County Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 374, 60 S.Ct. 317, 318–319, 84 L.Ed. 329 (1940), where the Court speaking through Chief Justice Hughes, said:

> [S]uch broad statements as to the effect of a determination of unconstitutionality must be taken with qualifications. The actual existence of a statute, prior to such a determination, is an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration. The effect of the subsequent ruling as to invalidity may have to be considered in various aspects,—with respect to particular relations, individual and corporate, and particular conduct, private and official. Questions of rights, claimed to have become vested, of status, of prior determinations deemed to have finality and acted upon accordingly, of public policy in the light of the nature both of the statute and of its previous application, demand examination. These questions are among the most difficult of those which have engaged the attention of courts, state and federal, and it is manifest from numerous decisions that an all-inclusive statement of a principle of absolute retroactive invalidity cannot be justified.

In *Lemon v. Kurtzman*, 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973), *Norton* came under further critical scrutiny. There Chief Justice Burger said:

> However appealing the logic of *Norton* may have been in the abstract, its *abandonment* reflected our recognition that statutory or even judge-made rules of law are *hard facts on which people must rely* in making decisions and in shaping their conduct. This fact of legal life underpins our modern decisions recognizing a doctrine of nonretroactivity. (Empha-

sis supplied). 411 U.S. at 199, 93 S.Ct. at 1468.

Notwithstanding the seeming demise of *Norton* at the hands of its creator, it continues to have at least limited validity in Tennessee.

It was cited, and the pertinent language quoted, in *Beaver v. Hall*, 142 Tenn. 416, 217 S.W. 649 (1919); however, the Court declined to follow it.

In *Roberts v. Roane County*, 160 Tenn. 109, 23 S.W.2d 239 (1929), *Norton* was cited as "the general rule", but the court introduced an element of estoppel by adding

> But it is recognized that parties may so deal with each other upon the faith of such a statute that neither may invoke the aid of the courts to undo what they themselves have done. 160 Tenn. at 124, 23 S.W.2d at 243.

*Norton* was cited and followed in *Henry County v. Standard Oil Co.*, 167 Tenn. 485, 71 S.W.2d 683 (1934).

It was again followed in *State v. Hobbs*, 194 Tenn. 323, 250 S.W.2d 549 (1952), and in *O'Brien v. Rutherford County*, 199 Tenn. 642, 288 S.W.2d 708 (1955).

In *State v. Collins*, 528 S.W.2d 814 (Tenn. 1975), we applied the rule to a case "wherein the question before the court was the appropriate statutory punishment for the criminal offense with which defendant was charged."

However, in *Capri Adult Cinema v. State*, 537 S.W.2d 896, 899 (Tenn.1976), the latest pronouncement of this Court, the Court, without citing *Norton*, but citing *State v. Hobbs, supra*, with its qualifying language, in effect declined to follow the *Norton* rule, holding instead:

> The principle is well settled in civil litigation that when parties have dealt with each other at arms' length upon the basis of an unconstitutional statute, they are bound by the results of their actions.

The dissenting opinion *Capri* cited the *Norton* rule as set forth in *Henry County v. Standard Oil Co., supra*; however, this reliance was in the context of a conviction

under a criminal statute subsequently declared unconstitutional.

No reported Tennessee case has discussed the "void *ab initio*" approach in the context of the retroactive versus prospective application of a declaration of the unconstitutionality of a statute. While *Norton* may have some continuing validity under some circumstances, we do not consider it authoritative or dispositive of the issues at hand.

■■■ We think the better, more equitable and more realistic rule is that "an unconstitutional act 'is not void, but voidable only,' until condemned by judicial pronouncement." *Roberts v. Roane County, supra.* As phrased in *Bricker v. Sims*, 195 Tenn. 361, 368, 259 S.W.2d 661, 664 (1953):

> Every act of the Legislature is presumptively constitutional until judicially declared otherwise . . . .

The decisional law of Tennessee has followed the "presumption of validity" rule in numerous reported cases.[3]

In the case of *Perkins v. Eskridge*, 278 Md. 619, 366 A.2d 21 (1976), the Maryland Court of Appeals, in a most excellent opinion, focuses upon the issue thusly:

> . . . it seems clear that the modern trend has been away from the doctrinaire void ab initio approach toward the more realistic views which have applied tests of reasonableness and good faith to determine the consequences flowing from conduct undertaken pursuant to an unconstitutional act. 366 A.2d at 29–30.

Numerous reported cases deal with the issue of prospective application of decisional law declaring state statutes to be unconstitutional. See, e. g. *Deltona Corporation v. Bailey*, 336 So.2d 1163 (Fla.1976); *Barnett*

*v. Develle*, 289 So.2d 129 (La.1974); *Westbrook v. Mihaly*, 2 Cal.3d 765, 87 Cal.Rptr. 839, 471 P.2d 487 (1970); and *Austin v. Campbell*, 91 Ariz. 195, 370 P.2d 769 (1963).

In the landmark case of *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965) the Court established criteria for determining whether new constitutional rulings, in both civil and criminal cases, would be applied retrospectively or prospectively. The Court said:

> Once the premise is accepted that we are neither required to apply, nor prohibited from applying, a decision retrospectively, we must then weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation. 381 U.S. at 729, 85 S.Ct. at 1738, 14 L.Ed.2d at 608.

■■■ Many considerations enter into a determination of whether to apply a decision of this nature retroactively. A foremost consideration must be fundamental fairness. The Court, in *Cipriano v. City of Houma*, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969), recognized this:

> [where] a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the "injustice or hardship" by a holding of nonretroactivity. 395 U.S. at 706, 89 S.Ct. at 1900, 23 L.Ed.2d at 652.

The Supreme Court in *Chevron Oil Company v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), set forth standards or factors in cases dealing with retroactivity:

> First, the decision . . . must establish a new principle of law, either by

---

**3.** *Collier v. Montgomery County*, 103 Tenn. 705, 54 S.W. 989 (1900) (a contract made between county and sheriff under a law later declared unconstitutional held binding upon the parties and sheriff not permitted to disaffirm and collect greater amount); *Beaver v. Hall*, 142 Tenn. 416, 217 S.W. 649 (1919) (an unconstitutionally created court was a *de facto* court until there was a judicial determination of its invalidity); *Roberts v. Roane County*, 160 Tenn. 109, 23 S.W.2d 239 (1929) (county estopped from recovering money paid to sheriff

under a void statute); *Claybrook v. State*, 164 Tenn. 440, 51 S.W.2d 499 (1932) (criminal liability may not be predicated upon conduct lawful under a statute subsequently declared unconstitutional); *Rust, et al. v. Newby*, 171 Tenn. 127, 100 S.W.2d 989 (1937) (The presumption in favor of the validity of statutes requires that they be observed until declared void by an authoritative tribunal); *State v. Hobbs*, 194 Tenn. 323, 250 S.W.2d 549 (1952) (county not permitted to recover salary paid under an unconstitutional act).

overruling clear past precedent on which litigants may have relied . . . or by deciding an issue of first impression whose resolution was not clearly foreshadowed. . . . Second, it has been stressed that "we must * * * weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation. Finally, we have weighed the inequity imposed by retroactive application." . . .. 404 U.S. at 106–107, 92 S.Ct. at 355, 30 L.Ed.2d at 306.

The Sixth Circuit, in *Rivera v. Rose*, 465 F.2d 727, 729 (1972), listed the criteria for determining prospective application as follows:

. . . (1) the purpose to be served by the new standard (2) the extent of the reliance by law enforcement officials upon prior decisions on the subject, and (3) the effect on the administration of justice of a retroactive standard.

Finally, in *Lemon v. Kurtzman, supra,* the Court, in a matter of equitable cognizance, determining against retroactivity, saying:

In equity, as nowhere else, courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests, notwithstanding that those interests have constitutional roots. 411 U.S. at 201, 93 S.Ct. at 1469, 36 L.Ed.2d at 162.

The most excellent case of *United States v. Benitez Rexach*, 411 F.Supp. 1288 (D.Puerto Rico 1976), relying upon *Chevron, supra,* adds the important factor of "foreseeability of the lack thereof, that the legal doctrine or statute in question would be declared unconstitutional."

■ Prompted by these authorities and motivated by our concept of fundamental fairness, we believe the controlling considerations in determining whether to apply a declaration of the unconstitutionality of a statute on a retrospective versus a prospective basis are these:

(1) The prior history of the rule in question, its purpose and effect. *Linkletter, supra; Chevron, supra.*

(2) Whether retrospective operation will further or retard its operation. *Linkletter, supra; Chevron, supra; Rivera, supra.*

(3) Whether retrospective operation would produce substantial inequitable results. *Cipriano, supra.*

(4) Whether litigants and others similarly situated have relied upon the unconstitutional statute. *Chevron, supra; Rivera, supra.*

(5) Whether the declaration of unconstitutionality was foreseeable. *Chevron, supra.*

(6) The effect on the administration of justice. *Rivera, supra; Benitez Rexach, supra.*

While strictly speaking, we have not declared any statute to be unconstitutional,[4] we apply these criteria to the case at bar, and with specific reference to Industrial Loan and Thrift Companies.

The history of the constitutional and statutory provisions of Tennessee relating to interest are set forth in great detail in the main opinion. The purpose and effect of the qualified declaration of unconstitutionality was to bring the laws of Tennessee relating to interest rates charged by Industrial Loan and Thrift companies into harmony with the pertinent provisions of the Constitution of Tennessee. This purpose and effect will be accomplished irrespective of its application. In our view, general retroactive application will only serve as a penalty and will neither further nor retard the effective operation of the decision reached.

Wholly retrospective operation will produce substantial inequitable results. Cum-

---

4. The main opinion holds that "Sec. 45–2007(f) is unconstitutional and void, insofar as it is applied to any note or obligation, discounted at $7\frac{1}{2}\%$ per annum and payable in monthly installments, or to any other transaction, regardless of how payment is programmed, if the end result is an effective rate of interest in excess of ten percent."

berland Capital asserts in its petition to rehear that "[m]illions of transactions involving billions of dollars have been undertaken in reliance on it." While we do not know the specifics, we are persuaded that the impact of general retroactive application would be enormous.

While we are only concerned in this action with the constitutionality of Sec. 45–2007(f) T.C.A., it is possible that the rationale of this opinion will apply to other statutes, however, they are not before the Court for consideration, and it would be improper for us to make an advance determination on financial institutions not parties to this controversy.

Industrial Loan and Thrift Companies have relied upon the constitutionality of Sec. 45–2007(f) T.C.A.

Applying this decision on a wholly retroactive basis would not only result in financial disaster to the affected lending agencies that have loaned in the manner and at the rate authorized by the Industrial Loan and Thrift Act, but would clog the courts for years to come with untold lawsuits brought by those who would seek to avoid their solemn contractual commitments.

■ We apply the decision in this case to all notes, contracts, and obligations signed, or incurred, on and after August 23, 1977, and to all interest accruing on and after that date, irrespective of the date the instrument was signed, or the obligation was incurred. However, we apply it retroactively to all cases wherein there has not been strict compliance with the Industrial Loan and Thrift Company Act as set forth in Section 45–2001 through Section 45–2021, T.C.A.; (Main volume and 1976 Supplement).

Consideration of fairness and public policy, along with the criteria herein discussed, command this conclusion.

As indicated in our main opinion, we apply the decision retroactively to the instant suit.

We fully realize that there are other litigants now in various stages of trial or appellate process who will be foreclosed by the rule of limited prospective application we have announced. This is an unavoidable consequence of the basic principle that this Court may not give advisory opinions. If we do not apply the rule we announce to the case at bar, everything we have said becomes advisory in nature and is pure dicta. If we do not apply it to Industrial Loan and Thrift Companies that have not fully complied with statutory provisions, we would be legitimating unfair lending practices.

The Supreme Court of the United States faced this problem in *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), and said:

> Inequity arguably results from according the benefit of a new rule to the parties in the case in which it is announced but not to other litigants similarly situated in the trial or appellate process who have raised the same issue. But we regard the fact that the parties involved are chance beneficiaries as an insignificant cost for adherence to sound principles of decision making. 388 U.S. at 301, 87 S.Ct. at 1972, 18 L.Ed.2d at 1206.

Further, and on somewhat less esoteric grounds, we find that "the party who brings about the change in law may not properly be deprived of the fruits of his victory". Schaefer, "The Control of 'Sunbursts': *Techniques of Prospective Overruling,*" 42 N.Y.U.L.Rev. 631 (1967), *reprinted in* R. Leflar, *Appellate Judicial Opinions*, at 141 (1974).

And as the California Supreme Court said in *Li v. Yellow Cab Co.*, 13 Cal.3d 804, 119 Cal.Rptr. 858, 876, 532 P.2d 1226, 1244 (1975):

> [T]he new rule here announced should be applied additionally to the case at bench so as to provide incentive in future cases for parties who may have occasion to raise "issues involving renovation of unsound or outmoded legal doctrines."

Hence, we apply the new rule to the case at bar, but prospectively to all present or future litigants, except in those cases where the lender did not comply with the Industrial Loan and Thrift Act.

COOPER, C. J., and FONES, J., concur.

HARBISON, J., dissenting in part, concurring in part.

HARBISON, Judge, concurring in part, dissenting in part.

I concur in the majority opinion overruling the petition for rehearing, except that portion dealing with the prospective operation of the decision of the Court.

As pointed out in the majority opinion, this case was before the Court on a limited, expedited interlocutory appeal, in which only two questions had been certified by the trial judge. This was emphasized in the principal brief filed on behalf of the lending agencies, in which it was stated that the case was in this Court "for consideration solely of the two questions he certified . . . ." Again, in their brief, appellants stated:

"The general, abstract, constitutional question is the sole determinative issue in this case, and it will be so treated here."

In my opinion the Court answered the two certified questions fully and completely in its principal opinion and remanded the case to the trial court for further testimony and for final decision. As was pointed out in the case of *Tennessee Department of Mental Health v. Hughes*, 531 S.W.2d 299, 300 (Tenn.1975), in dealing with interlocutory appeals the Court requires the exact and precise questions to be reviewed to be stated in the order granting the appeal, and limits its decision to those specific questions. For this reason, it seems inappropriate to me to attempt to deal with the ramifications of the decision or with any other questions pertaining to it, in light of the incomplete and undeveloped record which is before the Court.

Further, I do not consider that the decision in the principal opinion was a material or major departure from prior decisional law in this State. On the contrary, it seems to me to be entirely consistent with the previous cases. In *Pugh v. Hermitage Loan Company*, 167 Tenn. 389, 393, 70 S.W.2d 22, 23 (1934), the Court said:

"A statute permitting a lender to charge sums as compensation for the use of money which amount to more than at the rate of ten per cent per annum is in clear conflict with the Constitution, whether the charge be denominated in the statute interest or fees or by any other name."

For these reasons, at this time and on the present record, I am unable to concur in so much of the Opinion on Petition to Rehear as deals with the issue of prospective application of the decision. Interlocutory appeals, no doubt, serve a useful purpose, but parties utilizing this special appellate procedure, occurring, as it were, in the midst of the handling of the case in the trial court, should not expect the Court to respond to any issues except those certified here.

I am authorized to state that Mr. Justice BROCK concurs in this Opinion.